Scoeield, J.,
delivered the opinion of the court:
On the 27th day of September, 1880, Lieutenant Hoyt, acting assistant quartermaster, U. S. Army, at Fort Assinaboine, *270 Mont., engaged the steamboat Rosebud, to be at Coal Banks about October 18, to take government employés and stores, down tlie Missouri River to Bismarck. The boat came and. shipped the men and freight as agreed. For this service the government paid at contract rates $1,742.27.
On the same day, and before the Rosebud was loaded, Lieutenant'Hoyt was notified that the Helena, one of claimant’s line of steamboats, had arrived and was ready to furnish the required transportation. Claiming the exclusive right under his contract of February 25,1880, to furnish this transportation, the claimant now brings suit to recover the amount paid for the Rosebud. This involves an examination of the contract. Article 1 provides as follows:
“I. The said Henry O. Akin shall furnish all the steamboat transportation required by the United States for officers, soldiers, government employees, horses, mules, and cattle, and public stores, on the Missouri River, from Yankton, Forts Randall,, Hale, Sully, Bennett, Yates, Abraham Lincoln (or Bismarck), Stevenson, Buford, D. T., Cow Island and Coal Banks, M. T., to Fort Benton, M. T., and from each to any other of the above points, and from and to any point on said river between Yank-ton, D. T., and Fort Benton, M. T., at any time from March 20,. 1880, to November 10, 1880, but not later than the respective limits of date of loading specified in Article III, and shall receive at any time during the period as aforesaid, from the officers or agents of the Quartermaster’s Department at Yankton and Fort Benton above indicated, all such public stores as may be offered or turned over to him for transportation.”
The part of article 3 above referred to reads as follows:
“And it is further provided that no steamboat shall be required to load with stores consigned to the Coal Banks or Fort Benton, at Bismarck later than the 10th of August, or at Yank-ton or at points between Yankton and Bismarck later than the 1st of August; nor with stores consigned to Cow Island, at Bismarck later than the 1st of October, or at Yankton or at points between Yankton and Bismarck later than the 20th of September; nor with stores consigned to Fort Buford, at Bismarck later than the 1st of November, or at Yankton or points ■ between Yankton and Bismarck later than the 20th of October.”
Article 10 defines the meaning of stores as follows :
“X. The word ‘stores,’ wherever appearing in this agreement, shall be understood to mean any property of the United States pertaining to any department thereof, which may be required to be transported by the Quartermaster’s Department; *271 also any personal property or baggage of officers, troops, anti others in tlie military service of the United States, the transportation of which, at public expense by the Quartermaster’s Department, is authorized bylaw or by regulations and orders-of the War Department.”
It will be observed that the claimant first agrees to furnish all transportation as late as November 10, but immediately qualifies his undertaking, as to time, by reference to certain-dates in article 3. He will not agree to furnish transportation “later [in the season] than the respective limits of date of loading specified” there. “The limit of date” therein specified from Bismarck to Coal Banks is August 10. The provision in article 3 is about loading “ stores.” The provision in article-1 is about furnishing transportation for both stores and men. The reference in the first article is made to obtain dates by which to limit transportation as to time, not as to subjects. The one says “stores” shall not be loaded after certain dates; the other that no transportation shall be furnished after the same-dates. This is the grammatical and legal construction of the language employed in the contract. It seems also to be in accordance with the business interests of both parties. Claimant’s, business was to carry passengers and freight. Why he would not agree to run a boat to Coa-1 Banks late in the season is easy to understand, but why, if compelled to run one, he -would reject government business of any kind, especially as there was-seldom enough, all told, to load a boat, is not so easy. It is said that carrying passengers was more profitable than carrying stores. Quite likely, but carrying both within the capacity of the boat would be still more profitable. ' That the claimant would agree to start a boat from Bismarck for Coal Banks as late as November 10, with only a few soldiers at stipulated prices on board, the government being all the time free to send its freight by rival lines, is scarcely credible. Yet that is the-construction the claimant asks üs to put ux>on his contract. That the government would agree to give claimant their most profitable business, to wit, carrying passengers, and hire other boats to take stores only, is equally incredible. By article 10, the baggage of officers and men is classed as stores. Under claimant’s construction the government would be compelled to send these officers and men in his boat, and charter another to- *272 take their baggage. In going from Cow Island to Coal Banks late in the season (a distance of 85 miles), as stated by claimant’s witness, a boat encounters “low water, sand-banks, snags, sevfen rapids, besides the danger of being frozen in for the winter.”
It seems to have been the intention of the claimant, as derived from the contract itself and all the surrounding facts, not to be bound to start a boat, however loaded, late in the season, beset with all these dangers, to Coal Banks. In accordance with this intention, after the specified “limit of date,” he carried to Coal Banks neither stores nor men. Although it cost the government for land carriage 93-J- cents additional for every 100 pounds of freight, he landed at Cow Island all consignments to the fort.
In this way we come to the coirclusion that after August 10 the claimant was not bound to furnish transportation for men or stores from Bismarek to Coal Banks. It follows as an almost necessary corollary that he was not bound to furnish it as late as October from Coal Banks down to Bismarck. If it were otherwise, the claimant would be compelled, at the call of the government, to have a boat at Coal Banks at any time prior to November 10, to take down men and stores, however few in number or small in amount, while the government would not be required to furnish any business up. The claimant not being bound to furnish this transportation down the river, the government was at liberty to contract with other parties.
The quartermaster at Fort Assinaboine, interpreting the contract as the court interprets it, nevertheless treated the claimant with all fairness. He knew that about October 18 a large number of employés at the fort would need transportation to Bismarck. By that time navigation to Coal Banks, already very difficult and uncertain, might, except for the smallest boats, become impossible. The Helena, on her last voyage, though freighted with government stores consigned to Coal Banks, was obliged to unload at Cow Island. He had good reason to fear that a trip by that boat to Coal Banks in the middle of October would be impossible. The Rosebud, smaller in size and lighter in draft, could be counted upon with greater certainty. To get ready and make the trip up the river would ' require two or three weeks’ notice. Therefore as early as September 27 he engaged the Rosebud. On the same day, with *273 unrequited consideration of claimant’s interest, be sent to bis agent tbe following telegram:
“Sept.- 27,1880.
“ToT. C. Power & Bro.:
“ On account of tbe uncertainty wbicb seemed to attend tbe movements of tbe Helena and'Butte on gov’t business during tbe last month, and tbe knowledge that the Meade was going to Bismarck, I did not think there would be any prospects of their coming to Coal Banks late in Oct., and have made other arrangements for getting employés down.
“ HOYT,
“Post Quartermaster.”
It was not the fault of defendants’ agent, but in disregard of bis timely notice, that a voyage possibly profitless was undertaken by tbe Helena. Nor is it tbe fault of lawyers that lawsuits grow out of a contract so inaptly worded that its uncertain meaning must be unsatisfactorily sought through construction and inference.
Tbe judgment of the court is that the claimant’s petition be dismissed.
Nott, J., did not sit at tbe hearing of this case, and took no part in tbe decision.