Jones, Chief Judge,
delivered the opinion of the court:
Plaintiff, a French corporation, brings this action to recover the sum of $15,000, held in “escrow” by the United States, to which plaintiff claims it is entitled by reason of the expiration of a reasonable period of time.
■ In 1938, plaintiff instituted a state court action in New York against the Jaeger Watch Company of New York to recover certain royalties due it under United States patents owned by plaintiff and licensed to Jaeger. In 1942, with the suit still in process, the Alien Property Custodian vested in himself the plaintiff’s rights and continued the litigation with himself as sole plaintiff. In 1950, the Attorney General of the United States, as successor to the Alien Property Custodian, revested in the plaintiff its rights in the New York suit subject to the conditions that the Attorney General be retained as a party plaintiff, and that the Attorney General collect out of any recovery obtained any royalties due to the United States by reason of war production.
In 1954, plaintiff was successful in having most of Jaeger’s defenses to the state action stricken. This resulted in the initiation by Jaeger of negotiations with plaintiff directed at *195 a settlement. Jaeger insisted, however, that any settlement of the New York action must be conditioned upon plaintiff’s obtaining a release from the Attorney General. The Attorney General refused to join in any compromise with Jae-ger until and unless he were guaranteed a sum in satisfaction of the royalties he believed were due the United States by reason of war production. Plaintiff denied that defendant was due any such sum, but, after considerable haggling, agreed with defendant that the latter would be paid $15,000 out of any settlement with Jaeger to be held in a suspense account marked “In escrow” to be finally disposed of as hereinafter discussed.
. Defendant, in return, promised to release any and all claims it might have against Jaeger. Incorporated within this agreement was a request by plaintiff that the Attorney General, as a part of its consideration, issue plaintiff a certificate to the effect that the $15,000 was due to defendant under the provisions of a Memorandum of Understanding between the United States and France dated May 28, 1948, known as the Byrnes-Blum Agreement.[1] Plaintiff also desired that the Attorney General obtain a like certificate from the Department of State. Plaintiff was of the opinion that such certificates would provide a basis for any claim made by it against the French Govermnent for reimbursement of the $15,000 under the terms of the Byrnes-Blum Agreement.
The State Department, however, declined to provide any such certificate on the ground that a collateral agreement had been entered into with France under which no payments would be taken by the United States subject to the Byrnes-Blum Agreement without first obtaining French clearance. Bather than create additional delay while the State Department negotiated for this clearance, the parties decided that plaintiff should pay the $15,000 into a special suspense *196 account on deposit with, the Alien Property Office, labeled “In escrow,” subject to repayment to plaintiff of “such part (if any) of the $15,000 as could not be retained by the defendant as a result of negotiations” with France. This deposit, or “escrow” as it is referred to by the parties, was established in 1954, but to date the defendant has failed to obtain the necessary clearance from the French Government and' the $15,000 remains on deposit with the Alien Property Office though more than 5 years expired before plaintiff filed this, action, and over 7 years have passed to date.
Plaintiff contends that since this “escrow” agreement contained no express provision for the time during which defendant was obliged to obtain the clearance of the French Government, it was implied that such concurrence would be obtained within a reasonable time. Plaintiff takes the position that, in the surrounding circumstances, 2 years is a reasonable period, thus the sum is and has been due and payable since April 15,1956.
It is defendant’s position that plaintiff’s claim grows out of a treaty, and that this court is without jurisdiction to-decide the merits because of limitations set forth in 28 U.S.C. § 1502. Even if this court does have jurisdiction, defendant argues, any obligation on the part of the United States to-return the -money on deposit, or any part of it, would arise-only in the event that the United States and France “agreed”' that plaintiff’s claim was outside of the provisions of the Byrnes-Blum Agreement. Plaintiff, it asserts, has no rights, in the deposited sum until this condition has been fully met..
Since defendant has challenged the jurisdiction of the-court, we must decide that question before we are entitled: to view the merits. Section 1502 of Title 28, U.S.C., upon-which defendant relies, provides:
Except as otherwise provided by Act of Congress, the Court of Claims shall not have jurisdiction of any claim against the United States growing out of or dependent., upon any treaty entered into with foreign nations.
Thus, if, as defendant contends, the claim here asserted grows-out of or is dependent upon the terms of the Byrnes-Blum-Agreement, then this court has no jurisdiction over the dispute. We need not speculate, however, over the meaning of *197 section 1502. The Supreme Court of the United States provided us with an objective standard when it defined section 1066 of the Eevised Statutes, the forerunner of the present section:
In our view of the case, the statute contemplates a direct and proximate connection between the treaty and the claim, in order to bring such claim within the class excluded from the jurisdiction of the Court of Claims by § 1066, Rev. Stat. In order to make the claim one arising out of a treaty within the meaning of § 1066, Rev. Stat., the right itself, which the petition makes to be the foundation of the claim, must have its origin— derive its life and existence — from some treaty stipulation. This ruling is analogous to that of the ancient and universal rule relating to damages in common-law actions; namely, that a wrongdoer shall be held responsible only for the proximate and not for the remote, consequences of his action. United States v. Weld, 127 U.S. 51, 57 (1888).
By way of further clarification, if any be required, the Supreme Court 5 years later held that a case growing out of a treaty is one involving rights given or protected by a treaty, and is analogous to a case arising under the Constitution or laws of the United States. United States v. Old Settlers, 148 U.S. 427, 468-69 (1893). A case arises under the Constitution or laws of the United States whenever its decision depends upon the correct construction of either. Osborn v. Bank of the United States, 6 U.S. (9 Wheat.) 251, 255-60 (1824).
The Byrnes-Blum Agreement has not been drawn into consideration in this case in the manner anticipated by the Supreme Court in the Old Settlers case, supra. We agree that there is a connection between the Agreement and the suspense account which has been presented to us for construction. Indeed, this case would never have arisen were it not for the existence of the Byrnes-Blum Agreement, because it is that very Agreement that motivated the parties to establish the “escrow” account around which this dispute is centered. Yet that is a far cry from finding that the claim before us “derives its life and existence” from some treaty stipulation, as the Weld case, supra, would require. Instead, the substance of plaintiff’s claim is derived from the original patent *198 license contract. Tbis is at the heart of its claim to royalties. The defendant comes into the case only by virtue of the fact that plaintiff’s rights in the patent were vested in defendant during the war years.
Defendant’s only claim to any real interest in the $15,000 is its assertion that some of the products made in those years were used in war production. In order to protect any rights that it might have had in that regard, defendant entered into the “escrow” agreement. This agreement is the only basis of defendant’s claim that it is entitled to the $15,000 which is before this court. It has never during this suit made any effort to prove that any part of the sum due it was because of war production. Hence, defendant has no inherent right to that money, and holds it on deposit only because of its “escrow” contract with plaintiff. Thus it can be seen that the Byrnes-Blum Agreement comes into the case only to the extent that it is that Agreement which provides the backdrop against which the suspense account evolved. This is a case arising out of a contract, and there is no direct and proximate connection between the claim and the treaty such as would oust this court from jurisdiction.
In support of its position the defendant relies on Eastern Extension, A. & C. Tel. Co. v. United States, 231 U.S. 326 (1913). In that case plaintiff, a British corporation, secured from Spain, in 1879, a concession for the construction of a cable between Luzon, Philippine Islands, and Hong Kong. Thereafter, the United States took possession of the Philippines, entering into a treaty of cession with Spain on November 7, 1900 (31 Stat. 1942). This treaty made no mention of any duties on the part of the United States with regard to the cable. Plaintiff continued to provide services in accord with its original concession with Spain, assuming the United States to be bound. On review, the Supreme Court held that this court had no jurisdiction over the issue because the petition drew the construction of the treaty directly into the case. That, of course, is not the case which lies before us. But the interesting thing about that case is that the Supreme Court went on to say that in spite of lack of jurisdiction in the context that the case was presented, the Court of Claims would be justified in finding that there existed a *199 contract implied in fact between plaintiff and the United States, entirely outside the treaty of cession, arising from the acceptance by the United States of plaintiff’s services. We feel that the contract in the case before us is no more closely attached to the Byrnes-Blum Agreement than the implied contract in the Eastern Extension case was to the Spanish concession and resulting treaty of cession. This brings us to the merits of our case.
Historically, an escrow was a delivery of a written document, delivered to a third person, the depositary being instructed to hold it until the happening of some condition not specified in the document itself. Corbin, Contracts §§ 247-49 (1952). Since that is so, it is not technically correct to consider this case in terms of escrow, for the $15,000 in this case was neither a document nor delivered into the hands of a third party. But the ordinary function of the traditional escrow is to give security to both parties to a transaction, and since that is exactly what was sought by the parties before us, the principles of the classic escrow apply. Plaintiff and defendant have joined issue on the construction of the memoranda which evidence the escrow condition.
As in most questions of government contract law where the Congress has not given us a statutory standard it is customary to apply the principles of general contract law. Priebe & Sons v. United States, 332 U.S. 407, 411 (1947). Thus, in construing any clause of a contract which has been drawn into dispute, the court is obliged to consider carefully three separate factors: (1) The circumstances and the events which surround the mating of the agreement; (2) the general purpose of the agreement, and (3) the language of the agreement itself. Gibbons v. United States, 15 Ct. Cl. 174, 190, aff'd, 109 U.S. 200 (1883). The weight to be given the individual factors must of necessity vary from case to case. In any event, it is most clear that it is improper to derive the intention of the contracting parties from a single word, phrase, or sentence in disregard of all other factors. This court may not write the terms for the parties; no more may it derive an intent which was not present, or place thoughts into the minds of the contractors or words into their mouths. *200 The language of the agreement, derived at arm’s-length, must be the important factor in the decision only as it lies shaded by the surrounding events.
The language which we must consider is derived primarily from the letters of defendant. On April 16, 1954, defendant wrote two letters to the plaintiff. In the first letter we find what purports to be a summarization of a verbal understanding reached by the parties concerning the “escrow” in a telephone conversation of the previous day. There is no exact memorandum of that conversation, but in its letter defendant said, in pertinent part:
Should it be agreed between the two Governments that any part of said sum does not come within the terms of the Memorandum of Understanding [Byrnes-Blum] that portion will be returned to you on your client’s behalf. [Emphasis added.]
In its second letter on the same date, defendant wrote:
The sum received by the Attorney General will be held by the Office of Alien Property until the conclusion of such discussions and such sum will be disposed of in accordance with any agreement reached as a result thereof. [Emphasis added.]
Such language as was used in these letters, apparently without active objection from plaintiff, would on first blush suggest that the agreement was in fact conditional upon the agreement of the two governments that the claim did not come under Byrnes-Blum. But we feel that it would be improper to be bound by phraseology out of context without a proper consideration of the effect of such a conclusion in relation to the initial bargaining stage.
Plaintiff’s purpose in agreeing to the “escrow” clearly was to provide a temporary respite in its dispute with the defendant over the entitlement to war royalties so that it could proceed with its settlement with Jaeger. The “escrow” provided the key to the apparent deadlock. Although the language of the letters provide one condition upon which the money was to be returned to plaintiff, it does not exclude any other. It does not exclude, for example, the conclusion that the $15,000 was to be repaid in the event of no agreement. We think that such an additional condition is im *201 plied from the initial conduct of the parties in relation to the Jaeger settlement. Beyond this, however, defendant, on October 6, 1954, wrote to the French Embassy in Washington, D.C., noting that the $15,000 had been paid to defendant “subject to the approval of French Government officials.” We think that this statement gives further impetus to the conclusion that defendant would not endeavor to retain the money unless the French Government approved.
Giving the “escrow” the effect desired by the defendant would be to create a potentially perpetual suspense account. We recognize the right of the parties to do just that if they clearly intend such a result. But in the light of the escrow with its underlying purpose such an arrangement would indeed be unusual. Thus, we prefer a more logical position. An ambiguous contract term will be interpreted in the light of the best business interests of both parties. See Akin v. United States, 17 Ct. Cl. 260 (1881). A perpetual escrow as defendant would potentially create would be in the best business interests of neither party.
We find that part of the consideration promised by defendant, in return for the money which it was to hold in escrow, was to obtain the clearance of plaintiff’s claim from the French, or, failing that, to return the payment.
There remains to be settled the element of time. If the parties did not intend that the suspense account remain open indefinitely, how long did it remain operative before plaintiff’s rights matured ? Under the principles of general contract law, where no time limit is given, it is presumed that performance will be completed within a reasonable time.[2] Plaintiff contends that 2 years would be a reasonable time and that its claim ripened accordingly on April 16, 1956, accruing interest from that date. In the context of diplomatic exchange such a position would be entirely too restrictive on the defendant and we cannot subscribe to it.
*202 The Commissioner has found as a matter of fact that in the circumstances a reasonable time has now- expired. Defendant challenges this finding on the ground that the wheels of international relations grind more slowly. True, but here apparently they did not grind at all. The trial commissioner’s findings on the question of what constitutes an unreasonable delay in the circumstances of this case are not shown to be in error and consequently are adopted by the court. Rule 46 (c) of this court, regarding exceptions to the trial commissioner’s findings, requires that each exception be supported by citations to the record. But defendant objects to the findings here only on the ground that plaintiff has failed to support its position by adequate evidence. But in so objecting defendant has not carried the burden imposed upon it by Rule 46(c). It has failed to show that a reasonable time has not yet expired by adequate reference to the record. Even in the complex world of diplomatic relations, it is difficult to believe that 7 years would not be a sufficient period in which to obtain the clearance of the French Government, or, in the alternative, to recognize the futility of the cause.
Judgment is entered for the plaintiff for the sum of $15,000. Since there is no statute or contract creating a right to interest, none is awarded. See Ramsey v. United States, 121 Ct. Cl. 426, 101 F. Supp. 353 (1951), cert. denied, 343 U.S. 977.
Davis, Judge; Duefee, Judge; Laramore, Judge; and Whitaker, Judge, concur.
FINDINGS OE FACT
The court, having considered the evidence, the report of Trial Commissioner Mastín G. White, and the briefs and argument of counsel, makes findings of fact as follows:
1. Societe Anonyme des Ateliers Brillie Freres, which is the plaintiff in this action and will usually be referred to hereafter in the findings as “the plaintiff,” was at all material times, and is now, a French corporation.
2. In 1938, the plaintiff instituted an action in the Supreme Court of the State of New York, Comity of New York, against the Jaeger Watch Company, Inc. (which will usually *203 be referred to hereafter in the findings as “Jaeger”), to recover royalties under United States patents owned by the plaintiff and licensed to Jaeger. In 1942, the Alien Property Custodian of the United States vested in himself the plaintiff’s rights in the State court action and in the patents on which the action was based. From that time until 1950, the Alien Property Custodian was the sole plaintiff in the State court case.
3. In May 1946, the defendant and the Government of France entered into an agreement that is commonly known as the Bymes-Blum Agreement (and it will be so referred to hereafter in the findings). Paragraph 6(c) of the Bymes-Blum Agreement provided as follows:
(c) As part of the general settlement, the French Government has agreed to process and pay all unpaid claims of French residents against the United States Government arising out of the use or infringement in war production of patent rights held by them, out of the requisitioning by the United States Government for use in the war program of any property interest owned by French residents, and out of acts or omissions prior to July 1,1946 in France or French overseas territories, of members of the United States Armed Forces or civilian personnel attached to such Forces.
4. In 1950, the Attorney General of the United States, as successor to the Alien Property Custodian, revested in the plaintiff its rights hi the State court lawsuit and in the patents referred to in finding 2. However, this was done subject to the following conditions, which were consented to by the plaintiff: (1) that the Attorney General would continue as a party plaintiff in the State court litigation, and (2) that the Attorney General could collect out of any recovery so much thereof as represented royalties on war production. (Subsequent references in the findings to “the Attorney General” will mean the Attorney General of the United States.)
5. Soon after the revesting mentioned in finding 4, a supplementary complaint was filed in the Supreme Court of the State of New York. This extended the time covered by the claim for royalties through the year 1950.
6. In March 1954, Jaeger opened negotiations with the *204 plaintiff to compromise and settle tbe State court action mentioned in previous findings. Jaeger offered to make a substantial payment, on condition that the Attorney General join in any such compromise and settlement. With regard to the amount of the payment, Jaeger indicated a willingness to pay $125,000, but the plaintiff at the time insisted that the amount should be $200,000. The plaintiff informed Jaeger that the matter of the proposed settlement would be discussed with the Attorney General or his representatives.
7. At a conference that was held in the Office of Alien Property, Department of Justice, on April 2, 1954, the plaintiff reported to representatives of the Attorney General the substance of the negotiations with Jaeger, as outlined in finding 6. The representatives of the Attorney General thereupon asserted a claim that the defendant was entitled, under the Byrnes-Blum Agreement (see finding 3), to a portion of any payment made by Jaeger; and they stated that the Attorney General would decline to join in any settlement with Jaeger unless the defendant’s claim were recognized. The plaintiff disputed the claim, but asked how much would be demanded by the defendant out of the payment by Jaeger. After considerable discussion and haggling, it was finally agreed that the defendant would receive $15,000 out of any payment by Jaeger up to $150,000, plus the first $5,000 of the excess if the payment should exceed $150,000, and that the defendant, in exchange, would release all of its claims against Jaeger. In this connection, the plaintiff asked the representatives of the Attorney General to obtain for the plaintiff certificates from the Attorney General and from the Department of State to the effect that the proposed payment of $15,000 (or more) was being made to the defendant because it was due under the Byrnes-Blum Agreement. The plaintiff desired the certificates for use as a basis on which to seek reimbursement from the French Government in an equivalent amount. The representatives of the Attorney General agreed to furnish such a certificate from the Attorney General, and to request such a certificate from the Department, of State.
8. Shortly after the conference of April 2, 1954 (see finding 7), an agreement was made under which the State court *205 litigation mentioned in previous findings was to be settled through the payment by Jaeger of $135,000.
9. Under the date of April 12, 1954, the attorney for the plaintiff wrote a letter to the Office of Alien Property, stating in part as follows:
* * * I am enclosing herewith form of stipulation of discontinuance, which it is proposed shall be signed by the attorneys for all the parties upon payment of the settlement sums.
Permit me also to remind you that I am expecting to receive from you due certification by the Attorney General and by the Secretary of State to the effect that the $15,000 payment to be made to the Treasurer of the United States is required by the Attorney General, pursuant to the memorandum of understanding between France and the United States of May 8, 1946.
The consummation of the settlement is scheduled for Friday of this week, so that I shall be grateful for confirmation from you before that date, * * * and for compliance with the request in this letter.
10. On April 15, 1954, a representative of the Attorney General orally informed the plaintiff that the State Department had declined to certify that the proposed $15,000 payment to the defendant was being made in accordance with the Byrnes-Blum Agreement; that the reason given by the State Department was that there was a collateral agreement between the defendant and the French Government to the effect that no payments would be accepted by the defendant under the Byrnes-Blum Agreement without obtaining advance clearance from the French Government; and that the State Department had suggested that the settlement with Jaeger be deferred until clearance from the French Government could be obtained. The representative of the Attorney General proposed to the plaintiff that, instead of delaying the settlement with Jaeger to await the outcome of the negotiations with the French Government, the settlement with Jaeger be consummated and the $15,000 claimed by the defendant as its share be turned over to the Attorney General for deposit in a special account, subject to the subsequent repayment to the plaintiff of such part (if any) of the $15,000 as could not be retained by the defendant as a result *206 of the negotiations with the French Government. The plaintiff indicated approval of this proposal.
11. (a) Under the date of April 16, 1954, the Office of Alien Property sent two letters to the plaintiff’s attorney. One of these letters stated as follows:
Enclosed herewith is a release running to Jaeger Watch Company, Incorporated, from the Attorney General of the United States, together with a letter addressed to you which reflects our opinion that the sum of $15,000 paid to us in settlement of the above lawsuit is received and retained by the Attorney General in accordance with the terms of the Memorandum of Understanding between the Government of the United States of America and the Provisional Government of the French Kepublic, of May 28, 1946. As explained to you telephonically, the Department of State will not issue a similar letter for the reason that the administration of the matters arising under the Memorandum of Understanding are handled by the Office of Alien Property.
It is our understanding that you will retain the foregoing release and letter in escrow pending delivery to the United States Attorney for the Southern District of New York, or to one of his assistants, of a certified check in the sum of $15,000.00, drawn to the order of either the Treasurer of the United States or the Attorney General of the United States.
In accordance with the telephone conversation had between you and Mr. Jaffe of my staff on April 15, the sum of $15,000.00 received by the Attorney General will be held by the Office of Alien Property pending negotiations and discussions with representatives of the French Government looking toward agreement between the two Governments that the said sum of $15,000, or any part thereof, is properly payable to the United States under the terms of the Memorandum of Understanding. Should it be agreed between the two Governments that any part of said sum does not come within the terms of the Memorandum of Understanding that portion will be returned to you on your client’s behalf.
Inasmuch as we intend to initiate discussions with the French Government, as outlined above, it is suggested that your client refrain from pressing any claim with the French Government at this time for reimburse [sic] of the sum of $15,000, and that it refrain from using our letter expressing our belief that the settlement *207 comes within the provisions of the Memorandum of Understanding in connection therewith.
The United States Attorney for the Southern District of New York has been authorized to execute a stipulation of discontinuance of the lawsuit similar in form and substance to the one you forwarded to this Office on April 12. The United States Attorney has also been requested to attend the closing of the settlement so that the delivery to him of the certified check may be accomplished simultaneously with delivery of our release to the defendant.
(b) The second letter referred to in paragraph (a) of this finding stated as follows:
The sum of $15,000.00 which the Attorney General of the United States receives in settlement of his interest in the above litigation is accepted as a compromise of the sums to which the Attorney General believes the United States to be entitled under the provisions of the Memorandum of Understanding between the Government of the United States of America and the Provisional Government of the French Eepublic dated May 28,1946.
As you know, the Office of Alien Property intends to initiate discussions with the representatives of the French Government in an effort to secure their agreement with the position taken by the Attorney General. The sum received by the Attorney General will be held by the Office of Alien Property until the conclusion of such discussions and such sum will be disposed of in accordance with any agreement reached as a result thereof.
12. The plaintiff’s attorney duly received the two letters mentioned in finding 11, and the other documents referred to in the letters, on April 17, 1954. He proceeded with the consummation of the settlement on April 19,1954, as planned. The sum of $15,000 out of the $135,000 received in settlement was paid to the Attorney General, as successor to the Alien Property Custodian, and has since been held in a suspense account marked “In escrow.”
13. Under the date of October 6, 1954, the Office of Alien Property wrote to the Assistant Financial Counselor of the French Embassy in Washington, D.C., a letter stating in part as follows:
*208 * * * Earlier this year, the defendant Jaeger Watch Company offered to settle the claims of Societe Anonyme Des Ateliers Brillie Freres and the Attorney General of the United States by the payment of the sum of $135,000. The attorneys for Societe Anonyme Des Ateliers Brillie Freres and this Office agreed that a fair sum for the compromise of the Attorney General’s claim would be $15,000. The said sum has been paid to the Attorney General of the United States and is now held by him subject, however, to the approval of French government officials as is contemplated by the Memorandum of Understanding between your Government and mine.
It is respectfully requested that you approve the payment to the Attorney General of the United States of the sum of $15,000 as a full settlement in compromise under the Memorandum of Understanding of the claims of the United States for the use in war production by the Jaeger Watch Company of the patents of Societe Anonyme Des Ateliers Brillie Freres. * * *
I will appreciate receiving from you as soon as possible the approval and concurrence of your Government to the retention by the United States of the sum of $15,000 which it has already received in settlement of its claims in the above matter. Should you require any further or additional information, Mr. Irving Jaffe of my staff will be pleased to discuss this matter with you.
14. The defendant has made repeated efforts — all unsuccessful — to obtain the concurrence of the French Government in the defendant’s claim that it is entitled under the Byrnes-Blum Agreement to retain the sum of $15,000. The most recent contact between the two Governments relative to this matter occurred in December of 1960. The French Government has informed the defendant that it does not concur in the defendant’s claim, that, in the opinion of the French Government, the defendant is not entitled to retain the sum of $15,000, and that such sum belongs and should forthwith be paid over to the plaintiff.
15. The defendant has failed and refused to pay the sum of $15,000 to the plaintiff, although it has been duly demanded.
16. A reasonable period of time after April 1954 for the defendant to obtain the concurrence of the French Govern *209 ment with respect to the retention by the defendant of the $15,000 has now expired.
17. Under the laws of France, aliens, including citizens of the United States, are accorded the same right to prosecute claims against the French Government in the courts of France as are French citizens.
CONCLUSION OE LAW
Upon the foregoing findings of fact, which are made a part of the judgment herein, the court concludes as a matter of law that plaintiff is entitled to recover in the amount of fifteen thousand dollars ($15,000), and judgment is entered to that effect.

 Paragraph 6 (o) of the Agreement provides as follows:
“As part of the general settlement, the French Government has agreed to process and pay all unpaid claims of French residents against the united States Government arising out of the use or infringement in war production of patent rights held by them, out of the requisitioning by the united States Government for use in the war program of any property interest owned by French residents, and out of acts or omissions prior to July 1, 1946, in France or French overseas territories of members of the United States Armed Forces or civilian personnel attached to such Forces.” 161 Stat. 417-6, 4176.]

 R. Guastavino Co. v. United States, 50 Ct. Cl. 115, 119 (1915); Corbin, Contracts § 96 (1952). Also, in the context of the traditional escrow, see Restatement, Contracts § 103(2) which provides :
“Until the time has elapsed for the happening of the condition that was fixed by the promissor when he delivered the document, or, if he then fixed no time, until a reasonable time has elapsed for the happening of the condition, the promissor has no power to annul the delivery. Thereafter he has a right to reclaim the document if the condition has not happened.”