**GERSTEN CONSTRUCTION CO., a California Corporation,**

v.

**The UNITED STATES.**

No. 134–61.

United States Court of Claims.
June 11, 1965.

Jacob Shearer, Los Angeles, Cal., for plaintiff. Joel C. Wise and Roger Peed, Washington, D. C., were on the briefs.

David Orlikoff, Washington, D. C., with whom was Asst. Atty. Gen. John W. Douglas, for defendant. Jay J. Levit, Washington, D. C., was on the briefs.

Before COWEN, Chief Judge, and LARAMORE, DURFEE, DAVIS and COLLINS, Judges.

COLLINS, Judge.

This action is based upon a contract entered into by plaintiff, a California corporation, and the Department of the Army. The contract which provided for the construction of a Capehart housing project [1] was performed by plaintiff. In its petition, plaintiff seeks to recover the amount of $92,216, plus interest, which amount defendant required plantiff to place in escrow prior to final settlement of the contract. Each party has moved for summary judgment in its favor.

The Corps of Engineers, Department of the Army, issued on March 20, 1958, an invitation for bids regarding the construction of a 618-unit Capehart housing project at Fort Belvoir, Virginia. Plaintiff submitted a bid in the amount of $9,625,926, and, on May 14, 1958, the Corps of Engineers awarded to plaintiff a letter of acceptability.[2] In accord with

---

1. The "Capehart Act" is the popular name of the following amendment to the National Housing Act: amendment of August 11, 1955, ch. 783, tit. IV § 401, 69 Stat. 635, 646–654, as amended, 12 U.S.C. §§ 1748a–1748g. Also, see 42 U.S.C. §§ 1594a–1594f.

2. Issuance to plaintiff of the letter of acceptability meant that plaintiff was bound to proceed with the project. In G. L. Christian and Associates v. United States, 160 Ct.Cl. 1, 13, 312 F.2d 418 (1963), this court (in note 9) offered the following explanation:

"The steps in a Capehart Act project are as follows: After deciding that a housing project should be built at or in connection with a post on government owned property, the Army (for example) would have preliminary plans prepared, secure a preliminary approval from F.H.A., and then issue an invitation for bids. A 'letter of acceptability' would be issued to the lowest acceptable bidder * * *, requiring it, inter alia, to organize one or more mortgagor-builders which would lease the underlying land from the Government and make arrangements with a financial institution to finance the project with a 100% mortgage. As construction proceeds, the mortgagor-builders draw money from the bank and pay the contractor. When the project is completed, the contractor will have received his full bid price and the mortgagor-builders will own the project, subject to a 100% mortgage to the financial institution which is the mortgagee. The stock of the mortgagor-builders, previously placed in escrow, will then be transferred to the Army. Thereafter, moneys appropriated to pay the housing allowances of personnel assigned quarters in the project buildings are used to service the mortgage. The Government, as

the requirements of the Capehart procedure, plaintiff, the "eligible builder," accomplished the organization of four Delaware corporations which were to be the "mortgagor-builders." [3] Also, plaintiff arranged to obtain the necessary financing from the Republic National Bank of Dallas. The bank sought insurance commitments from the Federal Housing Administration.

It was incumbent upon plaintiff to apply through the contracting officer, Col. George B. Sumner of the Corps of Engineers, to the Secretary of Labor for a determination of the current prevailing wages. As provided in the invitation for bids, the prevailing wage schedule would be used by the Federal Housing Commissioner to determine the appropriate adjustment in the contract price. In response to plaintiff's application, the Secretary of Labor issued a wage determination which was received by the contracting officer on June 11, 1958; the wages indicated in this determination were higher than those contained in the tentative schedule attached to the invitation for bids.

A copy of the new wage schedule was sent to the Federal Housing Administration. Also, Mr. Edward Kircher, an employee of the Corps of Engineers, telephoned the FHA and informed Mr. Ralph Cooper, the assistant chief architect of the District of Columbia Insuring Office of the FHA, that the Corps of Engineers was planning to negotiate with plaintiff an increase in the contract price. Mr. Cooper declined to take part in the nego-tiations; however, he expressed the opinion that the negotiated amount would be acceptable to the FHA so long as that amount was below $10,200,000, the statutory limit for the project.

Subsequently, plaintiff and the office of the contracting officer agreed that the proper increase, on account of the higher schedule of prevailing wages, would be $242,609.81. On June 17, 1958, the contracting officer wrote the FHA (i. e., Mr. Thomas C. Barringer, the director of the District of Columbia Insuring Office) that, if the agreement were acceptable to the FHA, the contract price would then be $9,808,535.81.[4] Noting that the initial closing was tentatively scheduled for June 24, 1958, the contracting officer requested that the FHA advise him promptly of the maximum insurable mortgage amounts.

No formal approval by the FHA of the negotiated adjustment was ever sent. However, on June 18, 1958, the FHA issued to the Republic National Bank and to plaintiff revised commitments for insurance, the total of which ($9,808,-535.81) included the wage adjustment negotiated by plaintiff and the contracting officer. Also, plaintiff and each of the mortgagor-builders (the Delaware corporations then owned by plaintiff) were required to execute a "trade payment breakdown," i. e., an FHA form indicating the amount of expense attributable to the various building trades, etc. The total cost shown on the trade payment breakdowns was the amount agreed upon by plaintiff and the contracting of-

owner of the mortgagor-builders, is liable for the outstanding indebtedness and maintains and operates the housing."

Regarding G. L. Christian, plaintiff's motion for rehearing was denied, 160 Ct. Cl. 58, 320 F.2d 345 (1963). The Supreme Court denied certiorari, 375 U.S. 954, 84 S.Ct. 444, 11 L.Ed.2d 314 (1963), and denied rehearing, 376 U.S. 929, 84 S.Ct. 657, 11 L.Ed.2d 627 (1964).

Another decision which describes the Capehart procedures is Anthony P. Miller, Inc. v. United States, 161 Ct.Cl. 455, cert. denied, 375 U.S. 879, 84 S.Ct. 149, 11 L.Ed.2d 111 (1963).

3. An explanation of the function of the "mortgagor-builders" is contained in note 2, supra.

4. On June 9, 1958, certain contract requirements had been changed with the result that the price was decreased from $9,625,926 (plaintiff's bid) to $9,565,926. The total stated in the June 17, 1958, letter of the contracting officer was arrived at by adding the adjustment of $242,609.-81 to the price of $9,565,926.

Subsequently, during the course of construction, various construction changes were effected with the result that the total contract price was increased.

ficer. These documents were accepted by the FHA (and by the Department of the Army) on June 24, 1958.

By June 26, 1958, the process of "initial closing" had been completed. In addition to the issuance of the insurance commitments and the approval of the trade payment breakdowns, there took place (on June 18, 1958) the execution of a tripartite housing contract by the Department of the Army, plaintiff, and each of the Delaware corporations. The total price of the four housing contracts reflected the wage adjustment agreed upon by plaintiff and the contracting officer. Plaintiff was to receive its payments from the respective mortgagor-builders (the four Delaware corporations). Simultaneous with the execution of the housing contracts, each of the mortgagor-builders entered into a building loan agreement with the Republic National Bank (the mortgagee).

The bank agreed to loan to each of the mortgagor-builders the total price of the housing project at the respective mortgage area. In turn, each Delaware corporation executed a note secured by a mortgage; the notes were endorsed for mortgage insurance by the Federal Housing Commissioner. Another aspect of the initial closing was plaintiff's depositing in escrow the stock of the Delaware corporations; upon completion of the project, the stock would be transferred to the Department of the Army.

Subsequent to the completion of the initial closing, plaintiff began the construction of the housing project. In March 1959, approximately 8 months after plaintiff had begun construction, the Comptroller General, in a report to Congress pertaining to the Fort Belvoir housing project, reviewed the circumstances of the adjustment of the contract price. The Comptroller General recommended that the Federal Housing Commissioner reconsider the wage adjustment and then advise the Corps of Engineers of the amount which *should* have been included as the wage adjustment and that the Corps of Engineers adjust the contract accordingly.

On May 18, 1959, after the report of the Comptroller General, Mr. Thomas C. Barringer of the FHA wrote the contracting officer that:

> Pursuant to the * * * [invitation for bids, etc.], the Commissioner (FHA) has determined that an amount of $150,392 is the sum necessary to reflect the increase attributable to the difference between the prevailing wage schedules dated March 17, 1958 and May 28, 1958.
> * * *

The contracting officer, in his reply of June 4, 1959, expressed the opinion that the previously accepted contract price, which contained the negotiated wage adjustment of $242,609.81, was legally binding and no longer subject to revision. The contracting officer stated that the parties had considered that the actions of the FHA in issuing revised insurance commitments and in endorsing the mortgage notes constituted approval by the FHA of the negotiated wage adjustment. On July 10, 1959, the Federal Housing Commissioner sent to the Comptroller General a letter which quoted the opinion of the contracting officer that the contract price was not subject to revision. The Commissioner then added, "If this opinion is correct, it will be impossible of course for the Corps of Enginers to take the action recommended in your report [to the Congress]."

The next stage in the dispute regarding the proper wage adjustment occurred on November 6, 1959, when the Comptroller General issued his decision that the price increase should have been $150,392 (the amount stated in the May 18, 1959, letter of the FHA), not $242,609.81 (the negotiated amount). The Comptroller General stated that the Secretary of the Army should insure that, upon final closing, the Government recover the difference between the two amounts. 39 Comp. Gen. 355, 359.

Previous to the decision of the Comptroller General, plaintiff had completed construction of the first of the four housing areas. On September 28, 1959, the FHA and the Department of the Army

accepted the first completed area. On the same date, final settlement of the pertinent contract was effected. Plaintiff received the full contract price for the area, although the Department of the Army questioned the propriety of paying plaintiff an amount which included an allocable part of the negotiated wage adjustment.

On November 24, 1959, as a result of the Comptroller General's opinion of November 6, 1959, the Department of the Army and the Federal Housing Commissioner required plaintiff to execute an agreement whereby plaintiff promised that, prior to the closing of the last mortgage area, plaintiff would "furnish to an acceptable depository to be held in escrow the total sum of $92,216.00 * * *." The effect of the agreement was that, after completion of the remaining construction, plaintiff would receive the total contract price (which included the negotiated wage adjustment), but subject to the requirement that plaintiff place $92,216, the amount of the alleged overpayment, in escrow. Plaintiff entered into the agreement under protest. It was necessary for plaintiff to execute the agreement in order to obtain final settlement of the second and third mortgage areas, which were accepted on November 24 and on December 16, 1959, respectively. Also, the agreement recited that the Department of the Army and the FHA refused to execute the determination of completion unless plaintiff would agree to enter into the escrow arrangement.

Plaintiff had filed an appeal, on November 17, 1959, with the Comptroller General, but on December 28, 1959, the Comptroller General issued a decision affirming his prior opinion. 39 Comp. Gen. 473. Shortly thereafter, plaintiff completed the last of the mortgage areas. In accord with the agreement of November 24, 1959, plaintiff, the Department of the Army, and the Federal Housing Commissioner, on January 20, 1960, entered into an escrow agreement which provided for the placing by plaintiff of $92,216

with the Federal Housing Commissioner, who was designated as the "Depository" or escrow agent. The escrowed sum, plus accrued interest, if any, was to be held by the depository until a final determination of the controversy by "any authorized Government Agency, Board or Court of competent jurisdiction * * *."

As required by the escrow agreement, plaintiff deposited the sum of $92,216 with the Federal Housing Commissioner. On January 21, 1960, final settlement of the last of the mortgage areas was accomplished. At that point, full performance of the construction contracts had taken place and only the issue of entitlement to the escrowed sum remained.

On April 8, 1960, plaintiff brought an action in the United States District Court for the District of Columbia. Plaintiff asserted a claim identical to that upon which the present action is based. The suit was brought against Julian H. Zimmerman as Federal Housing Commissioner and also as the escrow agent and against the four Delaware corporations (the stock of which had been delivered to the Department of the Army at the time of the respective final settlements). The district court, on October 3, 1960, granted the motion of the defendants to dismiss the complaint. The dismissal was without prejudice and was based upon plaintiff's failure to join as a defendant the United States, "an indispensable party."

On April 6, 1961, plaintiff filed the present action. In support of its motion for summary judgment, defendant asserts, *inter alia*, that plaintiff has failed to state a claim upon which relief can be granted by this court. According to defendant, plaintiff's action is based upon the fact that the FHA refused to make a determination of completion and to issue a final endorsement of the note for mortgage insurance, unless plaintiff agreed to the escrow. Thus, defendant contends that plaintiff's claim is against the FHA, not against the United States, and that, therefore, this court lacks jurisdiction.[5]

5. Under the Tucker Act, 28 U.S.C. § 1491, the jurisdiction of this court is limited to

"claim[s] against the United States * * *."

The argument of defendant is premised upon the notion that, for purposes of a suit such as the present one, the United States and the FHA are not one and the same.[6]

This court does not accept the assertions of defendant. At the outset, we note the inconsistency between (1) defendant's (successful) argument in the district court that the United States was an indispensable party, and (2) the present contention of defendant that plaintiff's action lies against the FHA, not against the United States. Taken together, defendant's arguments amount to a denial that any court is competent to adjudicate the dispute regarding the escrowed sum. For reasons to be demonstrated, defendant's concept of the nature of this action is incorrect.

It is true, as defendant points out, that, with regard to the construction contracts, the United States acted through the Department of the Army and not through the FHA. However, it is clear that the present dispute is between plaintiff and the United States (i. e., the Department of the Army).[7] According to plaintiff, full payment for the performance of the construction contracts must include the amount ($92,216) which was placed in escrow. As recited in the November 24, 1959, agreement between the Department of the Army and plaintiff, "the Department of the Army is obligated under the Housing Contracts to assume the rights and obligations of the mortgagor corporations, who have made or are to make payments to the Contractor [i. e., plaintiff] of the sums borrowed under [the] Building Loan Agreements * * *." In the case at bar, plaintiff seeks to establish its entitlement, as against the Department of the Army, to payment of the sum of $92,-216.

■ With regard to the effect of a judgment by this court on the escrow arrangement, plaintiff cites Societe Anonyme Des Ateliers Brillie Freres v. United States, 160 Ct.Cl. 192 (1963).[8] Defendant, on the other hand, seeks to distinguish Societe Anonyme on the ground that, in the case at bar, the disputed funds are held by a "third party, FHA * * *," not by the United States. In the opinion of this court, the distinction which defendant seeks to draw is invalid. That is, the notion[9] that, for purposes of litigation, the United States and the FHA are separate does not govern the instant case.

The important fact is that, in serving as escrowee, the Federal Housing Commissioner is not performing a function peculiar to his office. As plaintiff points

6. In support of its contention, defendant cites, inter alia, the following cases: United States v. Shaw, 309 U.S. 495, 160 S.Ct. 659, 84 L.Ed. 888 (1940); Waylyn Corp. v. United States, 231 F.2d 544 (1st Cir.), cert. denied, 352 U.S. 827, 77 S.Ct. 40, 1 L.Ed.2d 49 (1956). In Waylyn Corp., supra, the court relied upon FHA v. Burr, 309 U.S. 242, 60 S.Ct. 488, 84 L. Ed. 724 (1940).

For reasons to be explained, these decisions do not govern the instant case.

7. In this regard, two matters are noteworthy. First, the dismissal of plaintiff's action in the district court was predicated upon defendant's contention that the United States was an indispensable party to the cause. Secondly, the theory of the Comptroller General is that the $92,216 (which plaintiff claims) is an asset to which the Department of the Army became entitled. 39 Comp.Gen. 355, 359 (1959); 39 Comp.Gen. 473, 478 (1959).

8. In Societe Anonyme Des Ateliers Brillie Freres v. United States, supra, the plaintiff sought to recover the sum of $15,000, held in "escrow" by the United States. Due to the actions of the Attorney General, the plaintiff had been required to pay the $15,000 into a special suspense account on deposit with the Alien Property Office under the Attorney General. Plaintiff's right to repayment of the money depended upon the outcome of certain negotiations between the United States and France. This court held (p. 202) that the plaintiff was entitled to recover. The Government was obligated (absent agreement with France) to return the money to the plaintiff upon the expiration of a reasonable time, and a reasonable time had passed.

9. See cases cited in note 6, supra.

out, the depository or escrowee might just as well have been the Secretary of Defense or the Secretary of the Treasury.[10] In Societe Anonyme, supra, the Alien Property Office under the Attorney General was in effect an escrowee, and this court rendered judgment for the plaintiff for the amount in question. Similarly, with regard to the instant case, if, on the merits, plaintiff is entitled to recover, this would be accomplished by awarding judgment against the United States.[11] The judgment in Societe Anonyme, supra, was binding upon the Alien Property Office and upon the Attorney General. In the same way, a judgment for plaintiff in the instant case would be binding upon the escrowee.

■ Defendant raises the "theoretical possibility" that plaintiff would (1) obtain, from general Treasury funds, payment of the judgment of this court, and then (2) "seek recovery of the escrowed funds in a court of *competent jurisdiction*." In answer to defendant's argument, it is absolutely clear that, in no event, would plaintiff be entitled to more than one recovery of the disputed amount ($92,216, plus interest, if any). A judgment of this court would establish plaintiff's right to the amount in question, but such a judgment could also be used by defendant to bar any attempt which plaintiff might make to achieve "double recovery."

Defendant's assertion to the contrary notwithstanding, it is our view that a money judgment for plaintiff would accomplish "complete justice." From plaintiff's standpoint, a judgment measured by the amount of the escrowed sum, as set forth in the escrow agreement, would clearly suffice. Furthermore, upon the payment from general Treasury funds of

such a judgment, the logical step for the Federal Housing Commissioner to take would be to transfer the sum held by him in escrow to the appropriate Government account. Such a result woulld be in harmony with the purpose of the escrow agreement and would honor the rights of all concerned. Establishment of the escrow was a measure insisted upon by the Government for its own protection. We are not willing to permit defendant to use the existence of the escrow as the basis for depriving plaintiff of its opportunity to obtain a judgment in the amount of the disputed payment.

■ Since we reject the assertion of defendant that this court lacks jurisdiction, we turn next to the issues pertaining to the determination by the Federal Housing Commissioner of the proper wage adjustment. Plaintiff asserts that the FHA made an effective wage determination prior to the initial closing, and that the amount of that determination was $242,609.81, the amount negotiated by plaintiff and the contracting officer. Defendant, however, contends that there was no valid determination until the one (in the amount of $150,392) contained in the FHA's letter of May 18, 1959. That determination was made at the behest of the Comptroller General. The aforementioned letter was issued approximately 4 months prior to the completion of construction at the first of the mortgage areas.

■ This court is in agreement with the position of plaintiff. First, it must be noted that the FHA issued revised insurance commitments which were based upon the amount of the negotiated adjustment. Also, the FHA accepted the other instruments (e. g., the trade payment breakdowns) which included the

10. The November 24, 1959, agreement of plaintiff and the Department of the Army stated, in part, as follows:

 " * * * The Contractor covenants and agrees that prior to the closing of the last mortgage area in point of time it will furnish to *an acceptable depository* to be held in escrow the total sum of $92,216.00 * * *." (Emphasis supplied.)

11. As defendant points out, the escrow agreement of January 20, 1960, gives plaintiff a limited power to direct investment by the depository of the escrowed sum. This fact does not affect our conclusion that plaintiff is entitled to seek a judgment in this court.

980

amount of that adjustment. We hold that these actions of the FHA constituted adoption of the determination agreed to by the parties. That determination was translated into the contract and was binding on the Government. In so acting, the FHA did all that was necessary to put the wage determination into effect. This court rejects defendant's argument that this original determination was invalid.[12] The contractual provisions did state that the Federal Housing Commissioner would determine the adjustment in the contract price necessitated by any change in the prevailing wage schedule. Basically, as plaintiff points out, the making of the adjustment required (1) ascertainment of the number of man-hours for each wage category and then (2) with respect to each category, multiplying the number of man-hours by the applicable prevailing wage. The negotiations between plaintiff and the contracting officer of the Army related to ascertainment of the number of man-hours for the various types of labor.

Plaintiff contends that the Federal Housing Commissioner delegated to the contracting officer the task of determining the wage adjustment.[13] This court need not decide whether there was delega-

tion as such, for, as indicated, we find that the Federal Housing Commissioner adopted and ratified the adjustment arrived at in good faith by plaintiff and the Department of the Army. Under these circumstances, we hold that the determination (in the amount of $242,609.-81), as added to the contract, was valid and binding on the Government and on plaintiff.

Secondly, plaintiff is correct in emphasizing that the contract required the determination of the FHA to be made *prior* to the initial closing. For example, paragraph 20 of the invitation for bids stated, in part, as follows:

* * * *prior to the closing date,* a final * * * [schedule of prevailing wages] will be obtained from the Secretary of Labor and the acceptable bid adjusted in accordance with paragraph 5 above [i. e., adjusted in accord with the determination of the Federal Housing Commissioner]. (Emphasis supplied.)

If it were not obligatory that the determination of the FHA be made prior to the initial closing, then the provision of paragraph 5 (of the invitation for bids) [14] giving the eligible builder, under certain circumstances, the option to with-

12. Defendant has offered as an exhibit the affidavit of Ralph Cooper who, at the time of the Fort Belvoir project, was the assistant chief architect of the D. C. Insuring Office of the FHA. Mr. Cooper states that FHA issued insurance commitments based upon the contract price which included the negotiated wage adjustment, because that contract price did not exceed FHA's mortgage limitation. According to Cooper, FHA did not verify arithmetically the negotiated increase. Based upon this affidavit, defendant fashions an argument to the effect that FHA's "blind acceptance" of the negotiated adjustment resulted in the "mistaken" issuance of the insurance commitments and that such actions did not constitute a valid "determination." Defendant cites a number of cases, e.g., John A. Johnson Contracting Corp. v. United States, 132 Ct.Cl. 645, 132 F.Supp. 698 (1955), all of which are materially distinguishable.

13. Plaintiff points out that the Federal Housing Commissioner has the statutory power to delegate his functions to, *inter alia,* other Federal officers and employees. Act of June 27, 1934, ch. 847, tit. I, § 1, 48 Stat. 1246, as amended, 12 U.S.C. § 1702.

Also, the parties have referred to certain directives of the FHA dealing (1) with construction changes relative to armed services housing (ASHMI letter No. 27, Nov. 21, 1958), and (2) with wage adjustments (ASHMI letter No. 29, May 5, 1959). The latter, issued after the Comptroller General's report to Congress on the Fort Belvoir project, states that responsibility for determining wage adjustments cannot be delegated by the FHA to any other agency.

14. Paragraph 5 of the invitation for bids provides, in part, as follows:
"* * * Any such adjustment [of the amount of the bids, resulting from a change in the minimum wage schedule] will be in an amount determined by the

draw its bid would be empty words and meaningless. Whatever the effect of the wage adjustment, the FHA was required to make that determination before the closing date.

 In the instant case, a timely determination was made and was used as the basis for the various instruments pertinent to the Capehart project. No question was raised as to the validity of the wage determination until the activities on the part of the Comptroller General, which led ultimately to the FHA's decision of May 18, 1959, that the adjustment should have been $150,392. Contrary to defendant's assertion, this court holds that the attempt of the FHA, approximately 11 months after the June 1958 initial closing, to revise the wage determination was void and of no effect and that the original determination continued to bind all persons concerned. The rights and obligations of the parties must be governed by the terms of the contract. The effect of the requirement that the determination of the FHA be made before the initial closing can be illustrated in the following manner: The decision embodied in the May 18, 1959, letter of the FHA was that the negotiated wage adjustment was excessive (to the extent of some $92,216). However, the decision which the FHA made, subsequent to the closing, *might* have been that the negotiated amount was too low (e. g., that the proper increase would be $300,000, not the negotiated amount of $242,609.81). If the FHA had issued a post-closing decision to the effect that the negotiated increase was too low, then the Government could properly have in-

voked the requirement that the FHA render its determination prior to the closing. Plaintiff could not have obtained the benefit of the (hypothetical) tardy determination. By the same token, in the instant case, the effort of defendant to enforce the FHA's untimely revision of the wage adjustment must fail.

Therefore, the conclusion follows that the actions of the Government in requiring plaintiff to place the disputed amount in escrow were improper. Plaintiff performed the contract and plaintiff was entitled to receive the full contract price, including the adjustment negotiated by the parties. Accordingly, plaintiff's motion for summary judgment is granted, and defendant's like motion is denied. Judgment is entered for plaintiff for $92,-216, plus the amount, if any, of accrued interest.[15] The exact amount of interest, if any, will be determined pursuant to Rule 47(c) (2).

---

Commissioner to reflect such differences, and the amount of the lowest acceptable bid and the FHA estimated replacement cost of the property or project will be amended in the amount so determined by the Commissioner, except that, *if such an adjustment would increase the amount of the bid above the amount of any other statutory maximum applicable to the insurable mortgage, the eligible builder will have the option of reducing his bid to such statutory maximum or of withdrawing his bid.*" (Emphasis supplied.)

15. The agreement of January 20, 1960, provides that the successful party is to receive the escrowed sum plus "interest accruing thereon, if any * *. *." Thus, to the extent, if any, that interest did accrue under the escrow arrangement, plaintiff is entitled to recover an equivalent amount. Such entitlement to interest is based upon the contract of the parties and, therefore, is fully in accord with the requirements of 28 U.S.C. § 2516(a).