**William L. BOSTON, Plaintiff,**

v.

**The UNITED STATES, Defendant.**

No. 96–254C.

United States Court of Federal Claims.

Feb. 25, 1999.

Mike Milligan, El Paso, Texas, for plaintiff.

Todd M. Hughes, Commercial Litigation Branch, Civil Division, United States Department of Justice, Washington, D.C., with whom were Frank W. Hunger, Assistant Attorney General, David M. Cohen, Director, and Sharon Y. Eubanks, Deputy Director, for defendant. Edward Martin, Judge Advocate General's Corps, United States Army Litigation Division, of counsel.

## OPINION

MARGOLIS, Judge.

This civilian pay case is before the Court on defendant's partial motion to dismiss and motion for summary judgment. Plaintiff William L. Boston, a federal civilian employee, alleges that the government under-compensated plaintiff during a two-year work assignment in the United Kingdom ("UK") by improperly classifying plaintiff's transfer as a permanent duty transfer, rather than a temporary duty transfer, and by making administrative errors that unnecessarily delayed the processing of other salary allowances. Plaintiff contends that this Court has jurisdiction to hear his claim under the Tucker Act, based on an implied-in-fact contract

with the government to fairly compensate him during his foreign exchange. Defendant seeks to dismiss plaintiff's complaint for failure to state a claim upon which relief may be granted because an implied-in-fact contract concerning pay and allowances cannot exist between an appointed federal employee and the government.[1] After carefully considering the written and oral arguments of both parties, the Court concludes that plaintiff's employment in the civil service was by virtue of appointment, rather than by virtue of an employment contract, and that any entitlement to allowances must therefore be based on the relevant statutes and regulations, not an implied contract. Defendant's motion to dismiss is therefore GRANTED.

## BACKGROUND

Plaintiff was a civilian employee of the United States Army Training and Doctrine Analysis Command, White Sands Missile Range, New Mexico ("TRAC–WSMR") from 1989 and throughout the relevant periods of this dispute. Sometime between late 1989 and mid 1990, plaintiff was approached by his superiors about a scientific exchange program whereby plaintiff would spend almost two years working at Fort Halstead, UK, located just outside London, while a British analyst would spend that same time working at TRAC–WSMR. The exchange program was well established, and had been supported for the prior eight years by a Memorandum of Understanding between the United States and the UK. Plaintiff received Permanent Change of Station ("PCS") orders for the exchange assignment on September 11, 1990. Plaintiff arrived at Fort Halstead on November 18, 1990, and ultimately returned to TRAC–WSMR on October 22, 1992.

Federal civilian employees on foreign assignments are entitled to certain allowances, including a living quarters allowance ("LQA")[2] and a post allowance ("PA"),[3] to compensate for housing and cost of living differentials in foreign areas. See 5 U.S.C. §§ 5923(a)(2), 5924(1). The rates of the allowances are determined by the Department of State ("DoS") and Department of Defense ("DoD") implementing regulations. See, e.g., DoS Standardized Regulations ("DSSR") §§ 060–63, 130, 220, 910, 920; DoD 1400.25–M (Civilian Personnel Manual ("CPM")) 592, subchapt. 2. Section 061 of the DSSR, *Post Classifications,* provides as follows:

> Classifications for temporary lodging, *living quarters, post,* transfer, education allowance, post differential at any place in foreign areas where employees may be assigned are provided in columns 2–7, respectively, of Section 920.

> (1) If the name of the post is listed in Section 920, the classifications shown for the post shall be applicable.

> (2) If the post is not individually listed in Section 920, but the country or area of assignment is listed, the appropriate classification for the country or area of assignment shall apply.

> (3) If neither the name of the post nor the name of the country or area is so listed, the classifications shown for "Other Foreign Localities" shall apply.

DSSR § 061 (2/24/91) (emphasis added). At the time when plaintiff was assigned to Fort Halstead, Fort Halstead was not listed as an individual post in section 920. There was, however, a listing for the "Greater London Area," which provided a PA rate of 30%.[4]

---

1. Although defendant also argued in its motion to dismiss that the Court of Federal Claims's jurisdiction over plaintiff's claim was preempted by the Civil Service Reform Act of 1978, Pub.L. No. 95–454, 92 Stat. 1111 (codified as amended in scattered sections of 5 U.S.C.), defendant expressly abandoned this position at oral argument. (*See* Trans. of Oral Args. at 11.)

2. The LQA is "a quarters allowance granted to an employee for the annual cost of suitable, adequate, living quarters for the employee and his/her family." DSSR § 131.1. LQA is payable to civilian employees when government-owned or government-rented quarters are not provided without charge at the employee's permanent duty station in a foreign area. *See* CPM 592 § 2–1(b).

3. The PA is "a cost-of-living allowance granted to an employee officially stationed at a post in a foreign area where the cost of living, exclusive of quarters costs, is substantially higher than in Washington, D.C." DSSR § 221.

4. The post allowance percentage rate is multiplied by the employee's spendable income to derive the allowance amount. *See* DSSR § 228.2.

The default or "Other" listing for the UK provided a PA rate of 15%. The "Greater London Area" rate for LQA was likewise greater than the "Other" rate for LQA.

Plaintiff expressed some concern over the need for pay augmentation soon after the possibility of the assignment to the UK materialized. Plaintiff's concerns were allayed, however, by his supervisor, Robert P. Bennett, who assured plaintiff that he would receive cost of living allowances at the "Greater London Area" rate. Shortly after agreeing to the exchange, in mid 1990, plaintiff was briefed on three separate occasions by the TRAC–WSMR Management and Manpower Office ("Manpower") regarding his entitlement to allowances, including the LQA and PA. Manpower advised plaintiff that Fort Halstead had not yet been established as a post for purposes of foreign assignments. Manpower alternated over the course of the briefings between telling plaintiff that Fort Halstead was inside and outside of the "Greater London Area" for purposes of determining his allowance rates. In those cases where he was told that Fort Halstead was outside the "Greater London Area," plaintiff was also told that he would need to establish Fort Halstead as a post after arriving there, and that his allowances would be based on the default or "Other" rate until the post was established and individually listed in section 920 of the DSSR. According to plaintiff, Manpower maintained at the conclusion of the third briefing that Fort Halstead was outside of the "Greater London Area."

Concerned with the conflicting information on allowances given to him by Manpower and Bennett, plaintiff sought clarification from TRAC–WSMR's higher command, U.S. Army Training and Doctrine Command, Fort Monroe, Virginia ("TRADOC"). The major at TRADOC to whom plaintiff was referred by Manpower refused to talk to plaintiff, however. Within hours of plaintiff's phone call to TRADOC, Bennett, in turn, called plaintiff. Bennett forbade plaintiff from discussing his allowances with any office other than Manpower, and further restricted plaintiff's interaction with Manpower to instances where Manpower initiated the contact. When plaintiff expressed his reservations about Manpower's ability to properly administer his allowances, Bennett assured plaintiff that Manpower would correct any problems. Plaintiff understood this statement to be a "firm commitment" from Bennett that plaintiff would receive the proper allowances. (*See* Boston Aff. at 3.)

Several months later, about August 1990, Bennett advised plaintiff that Manpower was establishing Fort Halstead as an individual post. Plaintiff received no additional information concerning the new post or his allowances until October 9, 1990, his scheduled departure date.[5] On October 9, Manpower advised plaintiff that it had not, in fact, established Fort Halstead as a post. Plaintiff immediately informed Bennett of the situation, and plaintiff and Bennett spoke with Manpower together. Manpower explained that no United States personnel were stationed at Fort Halstead who could assist in establishing Fort Halstead as a post before plaintiff arrived. Instead, plaintiff was advised that he would need to set up the post upon his arrival, and would receive allowances at the "Other" rate until the individual Fort Halstead rates were established. Manpower assured plaintiff that it would do everything in its power to secure additional allowances, but specifically warned plaintiff that it could not guarantee the availability of further allowances.

For approximately the first 23 weeks of plaintiff's assignment at Fort Halstead he received no allowances in addition to his base pay, even at the "Other" rate. It appears that the delay stemmed from confusion once plaintiff arrived at Fort Halstead over whether TRAC–WSMR or the Consolidated Civilian Personnel Office in London ("London CCPO") would administer plaintiff's exchange. According to plaintiff, it was only after an eleven-week period of deliberation that TRAC–WSMR decided to maintain administrative control over plaintiff's exchange. It appears from the record that in May 1991

---

5. Due to emergency medical reasons, plaintiff's actual reporting date at Fort Halstead was delayed until November 18, 1990.

plaintiff received reconciliation payments of $2,730.56 and $810.04, representing LQA and PA entitlement calculated at the "Other" rate from December 30, 1990 to April 20, 1991.

During the eleven-week period from November 18, 1990, to February 2, 1991, little or no action was taken by TRAC–WSMR or any other office to establish Fort Halstead as a post. On February 3, 1991, Bennett directed plaintiff to submit a Standard Form 1190 ("SF 1190"), which records an employee's lodging costs for the purpose of establishing the LQA rate. *See* DSSR § 073.4. Plaintiff completed and mailed the form to TRAC–WSMR on February 4, 1991. On February 20, 1991, Manpower directed plaintiff to submit a Retail Price Schedule Form, which records price data on goods and services in more than 100 categories for the purpose of establishing the PA rate. *See* DSSR § 073.2. Plaintiff completed and mailed the Retail Price Schedule Form to TRAC–WSMR approximately three weeks after speaking with Manpower on February 20, 1991. TRAC–WSMR received the completed SF 1190 on February 14, 1991, and the completed Retail Price Schedule Form on March 14, 1991. On April 16, 1991, TRAC–WSMR sent the forms to the TRADOC liaison officer to the DoS, to be forwarded to the DoS Office of Allowances. It was not discovered until August 1991 that the DoS Office of Allowances never received the forms. Shortly after this discovery, the SF 1190 was sent via facsimile to the Office of Allowances on August 12, 1991. The Retail Price Schedule Form was sent via facsimile to the Office of Allowances in December 1991.

The DoS listed Fort Halstead as an individual post in section 920 of the DSSR with an effective date of March 10, 1991. *See* DSSR § 920, pp. 48–56 (TLSR–466). Even after Fort Halstead was listed, however, the allowance rates remained at the same level as the "Other" listing while the DoS waited to receive and then processed the economic data contained in plaintiff's SF 1190 and Retail Price Schedule Form. *See, e.g.*, DSSR § 920, pp. 55–56 (TLSR–466). The DoS first raised the independent Fort Halstead LQA rate above the "Other" rate on August 25, 1991, and first raised the independent Fort Halstead PA rate above the "Other" rate on March 8, 1992. From these dates forward, it appears that plaintiff's entitlement to the LQA and PA was calculated on the higher rates established for Fort Halstead as an individual post.

From the time plaintiff arrived at Fort Halstead until he received the LQA and PA allowances, plaintiff struggled financially on only his standard pay. According to plaintiff, his base salary carried only one-third of its purchasing power in the UK. Plaintiff resorted to skipping meals and living in substandard accommodations to make ends meet.

On May 6, 1991, while the DoS continued to process plaintiff's economic submissions, plaintiff submitted a request to the DoS, through TRAC–WSMR, for a Special LQA to reimburse plaintiff for his temporary lodging expenses for the period of November 18, 1990 through December 14, 1990.[6] The DoS authorized the Special LQA on August 22, 1991, for the lesser of $90 per day, or the actual cost of plaintiff's temporary quarters. All other requests for additional allowances made by plaintiff while in the UK were unsuccessful.

Upon his return to the States, plaintiff continued to seek additional allowances from TRAC–WSMR for his time at Fort Halstead. TRAC–WSMR concluded that plaintiff had been under-compensated for his out-of-pocket expenses while at Fort Halstead. TRAC–WSMR submitted requests in July 1992 and April 1993 to the DoS Office of Allowances for a special allowance in the amount of $7,976.80 to compensate plaintiff. The DoS denied both requests on the ground that reclassification and payment of allowances could not be made retroactively. *See* DoS Denials of Retroactive PA and LQA to Boston, July 31, 1992, and June 9, 1993. TRAC–WSMR commissioned an investigation into plaintiff's case in accordance with Army Regulation 15–6 on June 14, 1993. The investigation concluded that plaintiff was entitled to additional compensation in an unspecified amount. In December 1994, TRAC–WSMR

---

6. Plaintiff lived in temporary housing from the time he arrived at Fort Halstead on November 18, 1990, until December 29, 1990, at which time he took up permanent quarters.

forwarded the findings of the investigation to the TRAC–WSMR Finance Office, and requested a Comptroller General ruling concerning plaintiff's claim for additional allowances. The Comptroller General has failed to issue a ruling on plaintiff's claim.

The essence of plaintiff's claim before this Court is that TRAC–WSMR's mishandling of plaintiff's foreign exchange constituted a breach of its implied contract to augment plaintiff's pay at a reasonable rate while plaintiff was assigned to Fort Halstead. Plaintiff contends that an implied-in-fact contract was created by the regulatory provisions governing allowances and by plaintiff's supervisor, Bennett, who represented that TRAC–WSMR would ensure that plaintiff's overseas allowances were set at proper levels. Plaintiff contends that TRAC–WSMR breached this implied contract by mismanaging the exchange, including failing to establish Fort Halstead as a post prior to plaintiff's arrival, improperly delaying the DoS Office of Allowance's receipt of the necessary paperwork needed to set allowance rates, and failing to involve more experienced offices, such as TRADOC or the London CCPO, in the administration of plaintiff's exchange.

Plaintiff alleges two counts in his complaint before this Court. First, plaintiff claims that his assignment was improperly made pursuant to Permanent Change of Station ("PCS") orders, rather than on a temporary duty ("TDY") status, which deprived plaintiff of TDY travel allowances in the amount of $61,053.26. Plaintiff contends that the PCS orders assigning him to Fort Halstead were invalid and unlawful because Fort Halstead had not been established as a post prior to plaintiff's assignment, and because the *Memorandum of Understanding* between TRAC–WSMR and Fort Halstead concerning the exchange program expired shortly prior to plaintiff's assignment. Accordingly, plaintiff argues that his assignment could properly have been made only on a TDY basis. TDY travel allowances include, in addition to base salary, full reimbursement of actual lodging expenses, plus no less than $90 per day for living expenses. *See* 5 U.S.C. § 5702. Plaintiff submits that his actual

lodging expenses exceeded the allowances he received for lodging by $3,003.26, and that he is entitled to $58,050 for living expenses ($90 times 645 days at Fort Halstead), for a total of $61,053.26.

Second, plaintiff claims in the alternative that he is entitled to $7,976.80 for retroactive LQA and PA for the period preceding the creation of Fort Halstead as an individual post with its own allowance rates.[7] Plaintiff alleges that but for TRAC–WSMR's unnecessary delay in establishing Fort Halstead as a post and forwarding plaintiff's SF 1190 and Retail Price Schedule Form to the DoS Office of Allowances, plaintiff would have begun receiving allowances at the higher Fort Halstead rate several months sooner than he did. Instead, defendant's mishandling of the exchange resulted in plaintiff receiving allowances at the lower "Other" rate for a significant portion of his tenure at Fort Halstead.

## DISCUSSION

Defendant has moved under RCFC 12(b)(4) to dismiss plaintiff's complaint for failure to state a claim because, defendant argues, plaintiff is employed by virtue of an appointment, which precludes the existence of an implied contract governing employment benefits or allowances. Defendant contends that, as an appointed employee, plaintiff's claim for allowances must be based only on the applicable statutes and regulations. As plaintiff's claim is based on an implied-in-fact contract, defendant concludes that plaintiff has failed to state a claim upon which relief may be granted. The Court agrees with defendant's position that plaintiff is precluded from recovering allowances based on breach of an implied-in-fact contract, and that dismissal is therefore in order. The Court concludes, however, that the proper disposition is not under RCFC 12(b)(4) for failure to state a claim, as defendant argues, but rather under RCFC 12(b)(1) for lack of jurisdiction.

### I. Motion to Dismiss for Lack of Subject Matter Jurisdiction

The Tucker Act, 28 U.S.C. § 1491, governs the United States Court of Federal Claims's

---

7. The $7,976.80 claim is comprised of $4,101.68 for retroactive LQA and $3,875.12 for retroactive PA.

jurisdiction. Under the Tucker Act, the Court of Federal Claims enjoys jurisdiction over non-tort money suits against the United States founded either upon the Constitution, a statute or regulation, or upon an express or implied contract with the United States. 28 U.S.C. § 1491(a)(1). Although plaintiff catalogs a litany of regulations allegedly violated by TRAC–WSMR,[8] plaintiff asserts that "the regulations ... do not form the basis of Mr. Boston's claim, but rather the corroboration for it." (Pl. Response at 7.) Instead, plaintiff bases his claim on an implied-in-fact contract that TRAC–WSMR would provide plaintiff with sufficient allowances to avoid financial hardship while on the foreign exchange.

■ In addressing a jurisdictional question, such as the question presented by this case, the Court accepts as true all undisputed facts alleged by the plaintiff. *See Scheuer v. Rhodes*, 416 U.S. 232, 236, 94 S.Ct. 1683, 40 L.Ed.2d 90 (1974); *Reynolds v. Army and Air Force Exch. Serv.*, 846 F.2d 746, 747 (Fed.Cir.1988). Where the truth of jurisdictional facts alleged in the complaint are challenged, however, the Court may consider relevant evidence to resolve that dispute. *See Reynolds*, 846 F.2d at 747; *Hedman v. United States*, 15 Cl.Ct. 304, 306 (1988), *aff'd*, 915 F.2d 1552 (Fed.Cir.1990). In this case, whether plaintiff was employed by TRAC–WSMR pursuant to appointment or an employment contract raises such a jurisdictional issue for the Court to decide.

### A. Jurisdiction Based on Implied–in–Fact Contract

■ Although this Court generally possesses subject matter jurisdiction over con-

tracts implied-in-fact, such is not the case for claims asserted by federal employees who are employed pursuant to appointment, rather than by virtue of an employment contract. *See Army & Air Force Exch. Serv. v. Sheehan*, 456 U.S. 728, 739–41, 102 S.Ct. 2118, 72 L.Ed.2d 520 (1982) (denying Tucker Act jurisdiction over appointed Army employee's breach of contract claim for wrongful discharge); *United States v. Hopkins*, 427 U.S. 123, 96 S.Ct. 2508, 49 L.Ed.2d 361 (1976) (holding that Tucker Act confers no jurisdiction over appointed civilian Army employee's claim for breach of employment contract); *Hedman*, 15 Cl.Ct. at 315–16 (denying Tucker Act jurisdiction over appointed federal employee's breach of contract claim for wrongful discharge). Where a federal employee holds his position by virtue of appointment, any entitlement to allowances must be based solely on the applicable statutes and regulations, and those statutes and regulations (or promises that they will be followed) do not give rise to an implied-in-fact contract. *See Chu v. United States*, 773 F.2d 1226, 1229 (Fed.Cir.1985) ("[A]bsent specific legislation, federal employees derive the benefits and emoluments of their positions from appointment rather than from any contractual or quasi-contractual relationship with the government."); *Zucker v. United States*, 758 F.2d 637, 640 (Fed.Cir.1985) ("[F]ederal workers serve by appointment, and their rights are therefore a matter of 'legal status' even where compacts are made.").

■ In this case, plaintiff attempts to do precisely what the courts in the above cited cases were unwilling to permit—namely, to fashion an implied-in-fact contract from the underlying regulations and a government of-

---

8. Plaintiff contends that the following regulations were violated by defendant in the course of administering his assignment to Fort Halstead: DSSR § 072.2 (agency to notify the DoS immediately upon assignment of employee to new post); DSSR §§ 072.11.1.a, 072.11.2.c (agency to forward SF 1190s and Retail Price Schedules to the DoS Office of Allowances as soon as possible after employee's arrival at a new post); DSSR § 072.11.1.c (agency to submit report once employee obtains privately leased housing); DSSR § 072.31 (agency to prepare and submit allow-

ance reports in conformity with required reporting schedules); DSSR § 072.32 (agency to notify the DoS if a required report is not submitted on schedule); CPM § 16–2.a (major command to oversee subordinate compliance with reporting requirements); CPM § 16–2.b (CPO to determine the necessity of advance reports); CPM § 16–3.a (CPO to submit SF 1190s and Retail Price Schedules directly to the DoS Office of Allowances); CPM subchapt. 16, App. A.3.a (agency to designate a well qualified approving officer for the SF 1190).

ficial's promise to abide by those regulations. Plaintiff asserts that because his assignment was not managed with the objective of preventing undue hardship, "[t]he *contract implied by the statute and regulations* was breached, and [plaintiff] is entitled to relief." (Pl. Ans. to Interrog. No. 2 (emphasis added).) Similarly, plaintiff notes that "Mr. Boston's superior, Mr. Bennett told Mr. Boston that TRAC–WSMR would ensure that his overseas allowances were set at proper levels." (Pl. Response at 7.) From this statement plaintiff concludes that "Mr. Boston had an agreement with Mr. Bennett, *the same agreement required by the regulations,* and the Government breached it." (*Id.* at 8 (emphasis added).) As the Court of Claims explained in *Shaw v. United States,* 226 Ct. Cl. 240, 640 F.2d 1254 (1981), "Federal officials who by act or word generate expectations in the persons they employ, and then disappoint them, do not *ipso facto* create a contract liability running from the Federal Government to the employee, as they might if the employer were not the government." *Id.* at 251, 640 F.2d 1254; *see also Zucker,* 758 F.2d at 640. Thus, if plaintiff was employed by virtue of an appointment, rather than by virtue of an employment contract, this Court lacks jurisdiction under the Tucker Act to hear plaintiff's claim for breach of contract.

In this case, "[n]othing in the record rebuts the presumption that a federal employee is employed by appointment and not by contract or quasi-contract." *Hamlet v. United States,* 63 F.3d 1097, 1102 (Fed.Cir.1995); *see also Sheehan,* 456 U.S. at 735–36, 102 S.Ct. 2118; *Hedman,* 15 Cl.Ct. at 315. The parties do not dispute that plaintiff was at all relevant times in the civil service, paid pursuant to the GS pay scale. Notwithstanding that defendant raised plaintiff's appointment

status as a bar to an implied-in-fact contract in its motion to dismiss and motion for summary judgment, plaintiff made no attempt to rebut that characterization in his response. On the contrary, at oral argument plaintiff freely conceded that he was not hired pursuant to an employment contract and that he was, in fact, an appointed member of the civil service. (*See* Trans. of Oral Args. at 6–7.) Given plaintiff's admission and the complete absence of any evidence to the contrary, the Court finds that plaintiff has failed to carry his burden of establishing subject matter jurisdiction by a preponderance of the evidence. *See Reynolds v. Army and Air Force Exchange Service,* 846 F.2d 746, 748 (Fed.Cir. 1988) and cases cited therein. The Court therefore lacks jurisdiction over plaintiff's claim to the extent it is founded on breach of contract.

The importance of this rule of law is particularly salient when it is considered in light of the Court's jurisdictional money mandating requirement. Where a claim is founded on statute or regulation, "the asserted entitlement to money damages depends on whether any federal statute 'can fairly be interpreted as mandating compensation by the Federal Government for the damage sustained.'" *United States v. Testan,* 424 U.S. 392, 400, 96 S.Ct. 948, 47 L.Ed.2d 114 (1976) (quoting *Eastport S.S. Corp. v. United States,* 178 Ct.Cl. 599, 607, 372 F.2d 1002 (1967)). As the Supreme Court made clear in *Testan,* however, it is not the case that "the violation of any statute or regulation relating to federal employment automatically creates a cause of action against the United States for money damages." 424 U.S. at 401, 96 S.Ct. 948. Where, as here, the underlying laws and regulations allegedly violated do not mandate the payment of money,[9] this juris-

---

9. A brief examination of plaintiff's claim demonstrates that he has failed to satisfy the Court's money mandating requirement. As to his primary claim for TDY allowances, plaintiff alleges that his assignment was improperly processed as a PCS assignment, rather than a TDY assignment, not that he was denied TDY allowances under money mandating regulations after deemed to be on a TDY assignment. Plaintiff cites no authority, and the Court is aware of none, that would permit this Court to determine whether TDY is the default status for an employ-

ee assigned by invalid orders, and whether plaintiff's travel orders were, in fact, invalid, as plaintiff contends. As to his alternative claim for LQA and PA, DSSR §§ 130 and 220 mandate the payment of money to plaintiff *only to the extent and in the amount that DSSR § 920 provides.* Yet, the essence of plaintiff's claim is that section 920 was not amended promptly enough, not that he was denied allowances at the rate it mandated. This Court's jurisdiction does not extend to such matters. *See Testan,* 424 U.S. at 400, 96 S.Ct. 948.

dictional flaw cannot be sidestepped by transforming the complaint into one based on breach of an implied contract. *Sheehan,* 456 U.S. at 739–41, 102 S.Ct. 2118. To hold otherwise "would extend Tucker Act jurisdiction to reach any complaint filed by a federal employee alleging the violation of a personnel statute or regulation." *Id.* at 741, 102 S.Ct. 2118.

## CONCLUSION

For the foregoing reasons, the Court finds that plaintiff's claim based on breach of an implied-in-fact contract does not fall within the Court's Tucker Act jurisdiction, as plaintiff holds his position by virtue of appointment, not an employment contract. Accordingly, defendant's motion to dismiss is granted. The Clerk will dismiss the complaint. No costs.