Rosilla A. ADARBE, et al., Plaintiffs,

v.

The UNITED STATES, Defendant.

No. 01–683C.

United States Court of Federal Claims.

Nov. 19, 2003.

Michael A. O'Hara, Florence, KY, for plaintiff.

Carolyn J. Craig, U.S. Department of Justice, Washington, DC, with whom were Peter D. Keisler, Assistant Attorney General, and Director David M. Cohen, for defendant. John Noel and Anne Levy, Department of the Navy, of counsel.

## OPINION

FIRESTONE, Judge.

■ This matter comes before the court on the parties' cross-motions for summary judgment and the motion to dismiss by the United States ("government").[1] The plaintiffs are Filipino nationals who are employed by the United States Department of Defense ("DOD") on Diego Garcia, an island in the Indian Ocean. The plaintiffs live and work on a U.S. military base on Diego Garcia. The plaintiffs contend that they are entitled to more compensation than they currently receive from the government. They charge that the government is liable to them for breach of contract or, in the alternative, for back pay based on violations of various statutes, regulations and agreements.

The government argues in response that the plaintiffs are "appointees" and do not have any contract rights against the government. The government also argues that the plaintiffs' claim for back pay also fails on the ground that none of the allegedly violated federal laws or regulations are money-man-

dating. In addition, the government contends that this court does not have jurisdiction over the plaintiffs' treaty-related claims. For the reasons set forth below, the court **GRANTS** the government's motion for summary judgment and its motion to dismiss the plaintiffs' treaty-related claims.

## BACKGROUND

The following facts are not in dispute unless otherwise noted. The plaintiffs, Rosilla Adarbe and those similarly situated, are Filipino nationals employed by the DOD on the island of Diego Garcia. Diego Garcia is a territory of the United Kingdom. The DOD operates various facilities on Diego Garcia under treaties with the United Kingdom. Diego Garcia does not have an indigenous population. All of the workers on the island, like the plaintiffs, have been brought to the island as military support personnel.

■ The plaintiffs are employed by the DOD pursuant to the Foreign Service Act, 22 U.S.C. § 3922(b)(2) (2003) ("FSA"). Under this Act, the Secretary of Defense is authorized to employ foreign nationals and set the terms of their employment, including a schedule of their wages. 22 U.S.C. § 3968(a)(1) (2003). As foreign nationals employed by the United States working outside of the United States, plaintiffs are classified as Foreign Service Nationals ("FSNs"). Included within the definition of FSNs are Third Country Nationals ("TCNs"). TCNs are FSNs who work in a country that is not their country of origin. Since the plaintiffs are Filipino nationals who are employed by the United States to work on Diego Garcia, they are TCNs.

TCNs from the Philippines are hired pursuant to a 1968 international agreement be-

---

1. The United States has moved to dismiss the plaintiffs' action for lack of jurisdiction under Rule 12(b)(1) of the Rules of the United States Court of Federal Claims ("RCFC"). As discussed *infra* Part B, the court finds that this case is properly considered on summary judgment, with the exception of the plaintiffs' treaty-related claims, which are properly considered on a motion to dismiss.

In addition, there is also pending with the court the government's June 19, 2003 motion to strike the affidavit of Rosalinda Casela, under RCFC 56(e). As the government notes in its

motion, many of the statements listed in Ms. Casela's affidavit are either conclusions of law, not based on the affiant's personal knowledge, or would otherwise be inadmissible as evidence. In accordance with RCFC 56(e), these types of statements may not be included in an affidavit. Accordingly, the court grants the government's motion to strike those portions of the affidavit of Rosalinda Casela which do not comport with RCFC 56(e). The court has not considered these statements in the following opinion on motion for summary judgment.

tween the United States and the Philippines. Offshore Labor: Philippines, December 28, 1968, U.S.-Philippines, 19 U.S.T. 7560. This agreement is referred to as the Offshore Labor Agreement ("OLA"). Under the OLA, Filipino employees of the United States must be paid in U.S. dollars. OLA, art. II, ¶ 4. The OLA further states that the "currently established practice in determining minimum basic wages for employees in offshore employment by U.S. Military Forces shall be maintained for present employees and for those employed after entry into force of this Agreement." OLA, art. II, ¶ 6.

The TCN workforce on Diego Garcia is managed under DOD regulations issued pursuant to authority granted by the FSA. More specifically, Subchapter 1231 of DOD Directive 1400.25–M delegates the management of TCN employees to various Commanders, based on the geographic location of the employment. DOD 1400.25–M, SC1231.5. Authority to manage these plaintiffs' employment has been delegated to the Commander in Chief, U.S. Pacific Command ("USCINCPAC"). DOD 1400.25–M, SC1231.5.2.2. Pursuant to its authority under DOD 1400.25–M, the USCINCPAC issued USCINCPAC Instruction 12200.1C ("USCINCPACINST 12200.1C") which deals with the employment and wage structure of TCNs hired pursuant to its authority. Under these instructions, TCNs can hold temporary appointments, which have to be renewed each year, or indefinite appointments, which do not have to be renewed each year. During the early 1990s, many of the TCNs on Diego Garcia held indefinite appointments. All indefinite appointments were converted by the DOD to temporary annual appointments in 1997 and 1998.[2]

The wage calculation system set forth in USCINCPACINST 12200.1C directs the government to pay the greater of two values to TCNs: either the home country rate or the host country rate.[3] The home country rate is the rate paid in the country of the employees' nationality for comparable labor; in this case the home country is the Philippines. The host country rate is the rate paid for comparable labor in the country in which the workers are employed. It is not disputed that Diego Garcia does not have an indigenous population and thus it does not have a local workforce made up of native persons. The government contends that under such circumstances there is no host country. The plaintiffs argue that the United Kingdom should be considered to be the host country, because Diego Garcia is a British colony. The government concedes that in setting these plaintiffs' wages it did not evaluate comparable wages for comparable work in the United Kingdom. TCNs on Diego Garcia have always been paid based on home country wage surveys of workers doing comparable work in the Philippines.

The regulations also provide that, in case this normal procedure does not yield the best approach in an individual case, the government is entitled to create, *ad hoc*, an alternative procedure. However, any proposed alternative procedures must be approved by the Assistant Secretary of Defense for Force

---

**2.** USCINCPACINST 12200.1C also delineates procedures for aggrieved parties, such as the plaintiffs, to contest the conditions of their employment under DOD 1400.25–M. After orally registering a complaint with his or her immediate superior, an aggrieved party may bring his or her complaint to a secondary supervisor if the immediate superior is unable to grant relief acceptable to the aggrieved party. If the aggrieved party is dissatisfied with the decision of the secondary supervisor, he or she can petition, in writing, the commanding officer for relief. The commanding officer will then notify the aggrieved party of his or her decision, including whether a hearing will be necessary to the disposition of the grievance. If the aggrieved party is not satisfied with the outcome of the hearing or the commanding officer's decision, appeal can be

sought to the USCINCPAC, whose decision is final. USCINCPACINST 12200.1.C, Chapter 12.

**3.** The system for calculating the rate to be paid to TCNs in the USCINCPACINST 12200.1C is divided into three steps. The first step is to calculate the home country rate, including base pay, living quarters allowance, home country bonuses and any overseas differential. The second step is to calculate the host country rate, taking into account such factors as base pay from the host country schedule, host country bonuses/seasonal allowance payments, host country housing benefits/allowances and other cash payments applicable to host country employees. The third step is to compare these two figures, and pay the TCNs the higher of the two. USCINCPACINST 12200.1C, App. A.

Management Policy before they may be implemented. DOD 1400.25–M, SC1251.5.1.

Until 1993, the military would periodically conduct a wage survey of local employers in the Philippines. The main purpose of the wage survey was to determine the local rate paid for labor in the Philippines so that the wages of FSNs working at Subic Bay and Clark Air Force Base in the Philippines could be set accordingly. This same wage survey information was also used as the home country rate for TCNs like the plaintiffs. The wage schedule was denominated in the currency of the Philippines, the peso. However, since the OLA requires that the TCNs be paid in U.S. dollars, the wage schedules for the Filipino TCNs were issued in pesos and then converted into dollars before payment to the TCNs.

As long as wage surveys were conducted, the wages of the plaintiffs were set according to the rate paid to Filipino FSNs. However, after the Naval Station at Subic Bay and Clark Air Force Base were closed, in the early 1990s, wage surveys were no longer conducted by the DOD for the Philippines. Without a Filipino FSN rate to which to peg the wage rate for the TCNs after the base closings, the wage rate of the TCNs on Diego Garcia was not adjusted and thus remained essentially frozen for the years 1992–1997.

Because of this wage freeze, the plaintiffs' salaries remained the same despite the fact that the value of the peso was declining. Thus, the plaintiffs were being paid at a much higher rate on Diego Garcia than comparable workers were receiving for the same work in the Philippines. Had the wage surveys continued, the plaintiffs' real wages in pesos would have remained the same, but because of the exchange rate they would have received fewer dollars when their wages were converted pursuant to the OLA.

After the peso had been greatly devalued as compared with the dollar over the course of several years, the United States determined that it was necessary to recalculate the wage rates for Filipino TCNs.[4] Eventually, the DOD decided to base the plaintiffs' wages on the rates paid to Filipino FSNs employed by the U.S. Embassy in the Philippines.[5] There are some differences between the way that FSNs employed by the U.S. Embassy in the Philippines and TCNs on Diego Garcia are paid. First, FSN salaries are not converted into dollars. Second, unlike Embassy employees, TCNs on Diego Garcia are subject to an annual salary increase cap. Therefore, there may be years when the Embassy employees receive a greater percentage raise than similarly situated TCNs on Diego Garcia.

This change in the wage calculation became effective for the plaintiffs and other TCNs upon reappointment to their positions when their terms expired. It is not disputed that each TCN signed a document that stated that he or she had been informed of the change in pay schedule. It is also undisputed that every single TCN opted to renew his or her one-year term appointment after learning of the wage rate change.

The result of this change in calculation of wages was to reduce the amount of money in dollars that the plaintiffs received. While the plaintiffs are still paid in dollars pursuant to the OLA, it is not disputed that their purchasing power in dollars has decreased due to the continued devaluation of the peso as compared with the dollar. For example, at one time the exchange rate was six pesos to the dollar; it is now over fifty pesos to the dollar.

In their amended complaint, the plaintiffs challenge the government's decision to use the U.S. Embassy wage schedule as a basis for their pay. They contend that the decision to use the U.S. Embassy wage schedule violates plaintiffs' contract rights and various regulations promulgated under the FSA, as well as the OLA. After discovery and brief-

---

4. It is not disputed that DOD regulations require that the employment conditions offered to TCNs not be so favorable as to create a privileged group within the host country. DOD 1400.25–M, SC1231.4.3.6

5. According to the government, the decision to use the Embassy wage schedules was made by the USCINCPAC, pursuant to a lengthy decision making process. The plaintiffs contend that the wage revision was not properly approved before it went into effect.

ing on cross-motions for summary judgment, oral argument was heard November 12, 2003.

## DISCUSSION

### A. Standard of Review

■ "Summary judgment is properly rendered when 'the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law.' Fed.R.Civ.P. 56(c)." *Unidynamics Corp. v. Automatic Prod. Int'l,* 157 F.3d 1311, 1316 (Fed.Cir.1998). "[T]he mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no *genuine* issue of *material* fact." *Anderson v. Liberty Lobby,* 477 U.S. 242, 247–48, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). "In deciding whether a genuine issue of material fact exists, the evidence must be viewed in the light most favorable to the nonmoving party with doubts resolved in its favor." *Unidynamics,* 157 F.3d at 1316. It is proper on a motion for summary judgment for this court to engage in interpretation of contracts and statutes. *Barseback Kraft AB v. United States,* 121 F.3d 1475, 1479–80 (Fed.Cir.1997); *Bausch & Lomb, Inc. v. United States,* 148 F.3d 1363, 1365 (Fed.Cir.1998). Even when the interpretation involves resolving some ambiguity in the language of the documents at issue, this court may properly resolve this ambiguity as a matter of law on a motion for

summary judgment. *Barseback Kraft,* 121 F.3d at 1480; *Bausch & Lomb,* 148 F.3d at 1365.

### B. Jurisdiction

■ Before turning to the cross-motions, the court will first address the government's contention that this court does not have subject matter jurisdiction over this case. In particular, the government contends that the court should dismiss the plaintiffs' claims for lack of subject matter jurisdiction if it concludes that the plaintiffs have not stated a claim that is cognizable under the Tucker Act, 28 U.S.C. § 1491.[6]

■ In this case, as in others, the government has made the common mistake of confusing "the issue of [subject matter] jurisdiction with the question of whether [the plaintiffs] can prevail on the merits" of their claim. *Clark v. United States,* 322 F.3d 1358, 1363 (Fed.Cir.2003). The general rule is that so long as the plaintiffs have made a non-frivolous claim that they are "entitled to money from the United States because a statute or regulation grants [them] that right," or because they have a contract right, this court has jurisdiction to settle the dispute. *Ralston Steel Corp. v. United States,* 169 Ct.Cl. 119, 340 F.2d 663, 667 (1965) (as quoted in *Clark,* 322 F.3d at 1363); *Cincinnati v. United States,* 153 F.3d 1375, 1377 (Fed.Cir.1998) (holding that "the invocation of the implied contract theory is sufficient . . . to set forth a basis for subject-matter jurisdiction."); *see also Lewis v. United States,* 70 F.3d 597, 602–03 (Fed.Cir.1995).[7]

6. The plaintiffs also rely on 28 U.S.C. § 2502 to establish jurisdiction in this court. The plaintiffs' reliance is misplaced. Section 2502 does not provide a basis for jurisdiction in this court. It merely provides aliens with a forum in which to bring suit if: 1. this court otherwise has subject matter jurisdiction over the claims at issue; and 2. the aliens' country of origin allows U.S. citizens to sue in its courts. The government does not dispute that the Philippines allows U.S. citizens to sue in its courts. *See Marcos v. United States,* 122 Ct.Cl. 641, 102 F.Supp. 547 (1952) (allowing Philippine nationals to sue in the Court of Claims). However, this is not relevant to the question of whether the plaintiffs' claims should be denied as a matter of law or dismissed for lack of subject matter jurisdiction.

7. This matter is not insignificant. If a case is dismissed for lack of subject matter jurisdiction it must be dismissed without prejudice and does not operate as a final disposition of the case for res judicata or other finality purposes. This leads to the result that a close case, one in which jurisdiction is properly alleged, may be dismissed for failure to state a claim, with prejudice, and therefore the plaintiff will be barred from bringing the case another time either in this court or elsewhere. However, if a case as pled clearly does not allege facts that allows this court to exercise jurisdiction, it will be dismissed for lack of subject matter jurisdiction. Since dismissal for lack of subject matter jurisdiction carries no preclusive effect, the clearly frivolous claim may be brought many times. This is anomalous because the clearly frivolous claim, since it may be

Because the plaintiffs have alleged the existence of a contract, and because they have alleged the violation of a money-mandating statute, they are properly before this court. *Clark,* 322 F.3d at 1363; *Cincinnati,* 153 F.3d at 1377. However, a judgment that the plaintiffs have properly invoked this court's jurisdiction is not a judgment that the plaintiffs have properly stated a claim which this court can remedy.

In addition to the above-noted claims, the plaintiffs also contend that the government has violated the OLA. Whether this court has jurisdiction over the plaintiffs' OLA-related claims turns on the meaning of 28 U.S.C. § 1502, which prohibits this court from exercising jurisdiction over "any claim against the United States growing out of or dependent upon any treaty entered into with foreign nations." 28 U.S.C. § 1502 (2003). Resolution of this issue requires a more thorough examination of the plaintiffs' arguments regarding their OLA claims and thus it will be examined in the opinion itself.

The court will first turn to the plaintiffs' contract and statutory claims for money damages. It will then examine the issue of jurisdiction over the plaintiffs' OLA claim.

## C. The Plaintiffs Have No Contracts of Employment with the United States

██ The plaintiffs have alleged that they had contracts of employment with the government, which the government breached by changing the way that it calculated their wages. The plaintiffs contend that both the USCINCPACINST 12200.1C, which was promulgated under the FSA, and the OLA, establish implied contract rights concerning how their wages are to be determined and how they are to be paid. The plaintiffs argue that the government breached these implied rights when it decided to use the U.S. Embassy wage schedule as a basis for their salaries.

The government responds that there is no contract between the government and the plaintiffs to be breached. The government argues that, as TCNs, these plaintiffs are

"appointed" to their positions and have no contract for employment with the government. The government contends that without a contract the plaintiffs' claim for breach of contract must fail as a matter of law.

The court agrees with the government. A claim based on a breach of an employment contract depends on the existence of an employment contract with the United States. In their Counter–Statement of Facts filed pursuant to RCFC 56.1(b)(2), the plaintiffs concede that they were not hired pursuant to an express contract with the United States government. Their claim of a contractual relationship, therefore, depends on the presence of an implied contract with the United States. For the reasons stated below, plaintiffs cannot establish an "implied-in-fact" contract with the United States.

██ It is well-established that "absent specific legislation, federal employees derive the benefits and emoluments of their positions from appointment rather than from any contractual or quasi-contractual relationship with the government." *Hamlet v. United States,* 63 F.3d 1097, 1101 (Fed.Cir.1995) (quoting *Chu v. United States,* 773 F.2d 1226, 1229 (Fed.Cir.1985)). If the plaintiffs' employment is by appointment, then an action for breach of contract is precluded. *Army & Air Force Exch. Serv. v. Sheehan,* 456 U.S. 728, 741, 102 S.Ct. 2118, 72 L.Ed.2d 520 (1982); *Boston v. United States,* 43 Fed.Cl. 220, 225 (1999). Moreover, no contractual relationship between the United States and a government employee will be found unless it is explicit. *Hamlet,* 63 F.3d at 1101; *Troutman v. United States,* 51 Fed.Cl. 527, 533 (2002).

Here, the plaintiffs have failed to identify any basis for the court to conclude that plaintiffs have an employment contract with the government. First, the plaintiffs have not identified any specific legislation or other writing that designates the plaintiffs as contractual employees rather than appointees. *Hamlet,* 63 F.3d at 1101. The plaintiffs agree that they have no express contract with the government. In addition, the FSA regulations pursuant to which the plaintiffs

brought many times, may in the end consume more judicial resources than the closer claim,

which, once dismissed, may not be brought again. *Lewis,* 70 F.3d at 603.

are employed refer to TCNs, like the plaintiffs, as appointees: 5 C.F.R. § 8.3 provides that "[p]ersons who are not citizens of the United States may be recruited overseas and *appointed* to overseas positions." 5 C.F.R. § 8.3 (2003) (emphasis added).

Second, contrary to the plaintiffs' contentions, the manuals that outline the plaintiffs' employment conditions refer to the employees as appointees. USCINCPACINST 12200.1C, which outlines the employment conditions of TNCs, specifically states that TNCs are employed pursuant to appointment. USCINCPACINST 12200.1C, Chapter 2.1. ("TCN employees ... will be *appointed* under Section 08.3, Rule VIII of the U.S. Civil Service Rules and Regulations [or they] ... will be *appointed* under the appropriate agency personnel regulations.") (emphasis added).

Finally, the record shows that these plaintiffs acknowledged that they were appointees when they signed "appointment affidavits" before their appointment. The appointment affidavit that each TCN signed before his or her employment became effective is labeled "Appointment Affidavit" and the signature line, above which each TCN was required to sign, is labeled "signature of appointee." *See* Standard Form 61, U.S. Civil Service Commission, Appointment Affidavits. Based on these undisputed facts, the court holds that the plaintiffs' employment with the United States was by appointment and not by contract. *See Hamlet,* 63 F.3d at 1101; *Troutman,* 51 Fed.Cl. at 533. Accordingly, the United States did not breach an implied-in-fact contract with the plaintiffs and is not subject to liability to them on any claims for breach of contract. Accordingly, the government is entitled to summary judgment on Count 1 of the plaintiffs' complaint.

**D. The Government is Not Liable to the Plaintiffs for Money Damages for alleged Violations of the Foreign Service Act or the USCINCPACINST 12200.1C**

The plaintiffs also claim that the government is liable to them for back pay for having violated the FSA, and in particular the regulations promulgated by the DOD

under that Act concerning FSN and TCN wages. *See* USCINCPACINST 12200.1C, App. A. More specifically, the plaintiffs allege that the government violated the USCINCPACINST 12200.1C and the DOD 1400.25–M, and thus the FSA, by failing to follow the procedures established under the USCICNPACINST 12200.1C for determining TCN wage rates and by failing to obtain the requisite approval before implementing an alternate procedure. USCINCPACINST 12200.1C, App. A; DOD 1400.25–M, SC1251.5.1.2. At bottom, the plaintiffs contend that the government erred because it failed to compare employee wages in the Philippines with comparable employee wages in the United Kingdom. According to the plaintiffs, the DOD should have considered wage rates in the United Kingdom because Diego Garcia is a British territory. The plaintiffs argue that the regulations require the government to pay workers the "greater" of either their home country wage or the host country wage. Here, they challenge the government's failure to consider the United Kingdom to be the host country for the purposes of the wage comparison, since Diego Garcia is a British Territory; thus, they argue that the DOD should have set the TCNs wage scale based on what British workers were earning, as this figure is higher than what Philippine FSNs earn. The plaintiffs also argue that even if the government's wage rate decision was correct, the government implemented the wage rate change before it was formally approved by the proper DOD authorities and, therefore, the plaintiffs are entitled to back pay for the period before the new rate was authorized to be applied. The plaintiffs contend that the regulations at issue are money-mandating and therefore they establish a claim for relief under the Back Pay Act. 5 U.S.C. § 5596(b) (2003).

The government responds that these plaintiffs are entitled to monetary relief neither under the FSA and its implementing regulations nor under the Back Pay Act. The government argues that the Back Pay Act is not self-executing and that in order to obtain relief under that Act, plaintiffs must first show that they are entitled to money dam-

ages under a separate "money-mandating" statute or regulation. The government argues that the plaintiffs' rights are defined by the FSA and that the FSA does not provide the plaintiffs with a basis for challenging compensation schedules. Accordingly, the government argues that the plaintiffs cannot challenge decisions regarding their pay rates in this court. In the alternative, the government argues that should this court conclude that the plaintiffs have identified a money-mandating statute or regulation, the plaintiffs have failed to state a claim in any event. The government argues that the government's actions with respect to plaintiffs' pay were justified and warranted and, therefore, as a matter of law, the plaintiffs are not entitled to back pay.

### 1. The Foreign Service Act Establishes the Plaintiffs' Exclusive Remedy

On several occasions FSNs or TCNs have sought money damages in this court for alleged violations of their rights under regulations promulgated by various federal agencies under the FSA. In each case the court has held that FSNs and TCNs do not have a right to recover damages for violations of the FSA. *See, e.g., Hunter v. United States,* 36 Fed.Cl. 257, 259 (1996); *Phaidin v. United States,* 28 Fed.Cl. 231, 234 (1993); *Ashgar v. United States,* 23 Cl.Ct. 226, 232 (1991); *Dos Santos v. United States,* 19 Cl.Ct. 681, 686–87 (1990).

In those cases, the courts reasoned that the FSA is analogous to the Civil Service Reform Act ("CSRA") and that like the CSRA, the FSA establishes a comprehensive scheme for federal service employees which defines and limits the rights of these employees to challenge personnel-related decisions. In particular, these decisions rely on *United States v. Fausto,* 484 U.S. 439, 108 S.Ct. 668, 98 L.Ed.2d 830 (1988), in which the Supreme Court determined that, because the CSRA's administrative remedies include a "comprehensive and integrated review scheme," it precludes people employed pursuant to it from having their adverse personnel actions reviewed by the Claims Court, under the Back Pay Act or otherwise. *Fausto,* 484 U.S. at 454, 108 S.Ct. 668. The Supreme

Court would not presume that Congress failed to provide judicial review because of an oversight; rather, as a matter of statutory interpretation, the Supreme Court concluded that when Congress excludes judicial relief, it does so intentionally. *Fausto,* 484 U.S. at 448, 108 S.Ct. 668.

In comparing the CSRA to the FSA, the *Hunter* court noted that the FSA, like the CSRA, includes procedures for grieving the "alleged denial of ... financial benefit to which the member claims entitlement under applicable laws or regulations." 22 U.S.C. § 4131(a)(1)(G) (2003); *Hunter,* 36 Fed.Cl. at 259. Also like the CSRA, the FSA establishes an administrative board to resolve grievances brought under the Act. 22 U.S.C. §§ 4135–38 (2003). For these reasons, the *Hunter* court concluded that employees hired under the FSA were limited to the relief provided for under the FSA and could not sue in the Court of Federal Claims for adverse personnel decisions related to their employment. In doing so, the *Hunter* court agreed with the previous decisions of this court in *Phaidin, Ashgar* and *Dos Santos.*

Today this court adopts the reasoning of the previous decisions in *Hunter, Phaidin, Ashgar,* and *Dos Santos* and also holds that the FSA's comprehensive remedial scheme is the exclusive remedy for grievances based on adverse personnel decisions of its employees; accordingly, the plaintiffs are only entitled to the remedies provided for under the FSA for TCNs. Unless the FSA provides these plaintiffs with the right to seek judicial redress of their wage complaints, the plaintiffs have failed to establish a claim for relief, whether under the Back Pay Act or otherwise. *Phaidin,* 28 Fed.Cl. at 234 (holding that the "Back Pay Act does not create a substantive right").

### 2. The Foreign Service Act and the US-CINCPACINST 12200.1C do not Provide for Judicial Review or Monetary Relief in Connection with the Plaintiffs' Claimed Violations.

As noted above, because the plaintiffs' remedy is limited to what the FSA provides, the court must now determine what remedies are available under the FSA

for TCNs. Congress has established an administrative forum to hear grievances filed by TCNs like the plaintiffs regarding the conditions of their employment. In particular, USCINCPACINST 12200.1C, which was promulgated pursuant to the FSA, delineates TCN rights related to their employment as well as a procedure for TCNs to file grievances related to their working conditions. USCINCPACINST 12200.1C. It provides that TCNs must be treated fairly; it provides that TCNs will be given the opportunity to present their supervisors with grievances resulting from dissatisfaction with any aspect of the TCNs' working conditions; it provides that TCNs may register complaints without fear of reprisal. USCINCPACINST 12200.1C. However, USCINCPACINST 12200.1C also specifically carves out an exception to its grievance procedure: grievances regarding wages are specifically excluded from administrative review. USCINCPACINST 12200.1C.[8] Without a right of administrative review of wage grievances, the plaintiffs are not able to obtain judicial review of those decisions. The plaintiffs' suggestion that the absence of administrative review must imply a right of judicial review is unsupported. The plaintiffs have accepted appointments in accordance with the applicable regulations. The regulations do not give appointees any rights in connection with their compensation schedule. In such circumstances, there is no basis for judicial review of the compensation schedules set under the FSA for TCNs.

■ In addition, even if grievances regarding wages were subject to review by the courts, the FSA vests the United States district courts with exclusive jurisdiction over those claims. The FSA provides that an aggrieved party "may obtain judicial review . . . [of] any grievance in the district courts of the United States. 22 U.S.C. § 4140 (2003). As this court has recognized, this plain lan-

guage means that the FSA's "specific vesting of review authority with district courts means that the district courts have exclusive jurisdiction over these claims." *E.g., Hunter*, 36 Fed.Cl. at 259; *see Ashgar*, 23 Cl.Ct. at 232. Consequently, claims brought under the FSA may not be reviewed in this court.

■ Finally, Congress has specifically precluded TCNs like the plaintiffs from obtaining judicial review in any case. Under the FSA only U.S. citizens may sue in district court for violations of the FSA. 22 U.S.C. § 4131(a)(1); *see Phaidin*, 28 Fed.Cl. at 234; *Dos Santos*, 19 Cl.Ct. at 686–87. This restriction applies not only to violations of the FSA itself, but also to violations of regulations and directives pursuant to the Act. *Dos Santos*, 19 Cl.Ct. at 686–87.

In view of the foregoing, the plaintiffs' claims based on violations of the FSA and the regulations promulgated thereunder fail as a matter of law. Congress has not provided a right to monetary relief for these plaintiffs. Under the FSA, the plaintiffs are not entitled to judicial relief in this court for the violations of the FSA and the USCINCPACINST 12200.1C that they allege. Accordingly, the government is entitled to summary judgment with regard to the plaintiffs' claims for monetary relief based on the FSA, the regulations promulgated thereunder, and the Back Pay Act.[9]

### E. This Court Lacks Subject Matter Jurisdiction to Adjudicate Claims Based on the Offshore Labor Agreement.

■ Finally, the court turns to the plaintiffs' claims for money damages based on the OLA. In Count 2 of its amended complaint, the plaintiffs charge that the government has violated the OLA. The government argues that this court does not have jurisdiction to hear the claims based on the OLA because of 28 U.S.C. § 1502, which prohibits this court

---

8. According to the Complaints and Grievances section of USCINCPACINST 12200.1C, the grievance procedures "are applicable to complaints and grievances initiated as a result of an employee's dissatisfaction with any aspect of his working conditions or as a result of an adverse personnel action. These procedures do not apply to the following: .. f. Compensation schedules

[and] related classification standards." USCINCPACINST 12200.1C, Chapter 12.

9. Having concluded that the plaintiffs do not have the right to a monetary remedy in this court under the FSA or the Back Pay Act, the court need not examine the merits of the plaintiffs' objections to their compensation rate.

from exercising jurisdiction over "any claim against the United States growing out of or dependent upon any treaty entered into with foreign nations." 28 U.S.C. § 1502. Specifically, the government argues that the resolution of claims under the OLA depend on the interpretation of that agreement, and therefore this court is precluded from hearing those claims.

The plaintiffs respond that the presence of a treaty bearing on an issue should not preclude the court from taking jurisdiction over an issue already within the court's competence. The plaintiffs argue that the OLA merely "strengthens" the arguments otherwise contained in their complaint, and so their claims are not "dependent upon" the OLA.[10]

■■■■ Under § 1502, unless otherwise specifically authorized by statute, the Court of Federal Claims is precluded from hearing "any claim against the United States growing out of or dependent upon any treaty entered into with foreign nations." 28 U.S.C. § 1502; *Societe Anonyme Des Ateliers Brillie Freres v. United States*, 160 Ct.Cl. 192, 196–97, 1963 WL 8581 (1963).[11] A claim will fall within the statute if the right that it is based on depends on the terms of the treaty for its force. *Ateliers Brillie Freres*, 160 Ct.Cl. at 196–97, 1963 WL 8581. However, just because a particular claim is barred because of § 1502, this does not mean that this court is prohibited from hearing related claims that do not depend on interpretation of a treaty for their viability. *See S.N.T. Fratelli Gondrand v. United States*, 166 Ct.Cl. 473, 478, 1964 WL 8545 (1964) (holding that this court may hear a claim founded upon the Constitution or an alleged breach of contract even though a treaty is raised in connection with those claims). Therefore, insofar as the claims of the plaintiffs are based on interpretation of documents other than the

OLA itself, like a statute, this court has jurisdiction to hear the claims. Even though, in the plaintiffs' words, the OLA "strengthens" their claims for breach of contract and statutory violations, the claims, based on authorities within this court's competence, are not prohibited to this court to adjudicate.[12]

However, that being said, insofar as the plaintiffs are actually relying on the OLA as the basis for the rights which they are seeking to vindicate, § 1502 squarely prohibits this court from taking jurisdiction to hear those claims.

■■■ The plaintiffs list three claims that are based on the OLA. First, the OLA requires that the "established practice in determining minimum basic wages for employees ... shall be maintained" after the entrance into force of the OLA. OLA art. II, ¶ 6. Second, the plaintiffs also claim that the agreement requires that the provisions of the OLA itself not be used to prejudice the contractual rights of employees who will be affected by the entrance into force of the OLA. OLA art. VI, ¶ 4. As to these two provisions, the plaintiffs claim that, because these rights under the OLA appear elsewhere, such as in established practice and in previous contracts, then the claims do not "depend upon" interpretation of the OLA. The plaintiffs conclude, incorrectly, that the presence of a nontreaty source of a right means that *any* source connected with that right may be the subject of this court's jurisdiction. The plaintiffs' error lies in the fact that they focus on the right at issue, and not on the source of that right. Here, § 1502 works to bar a specific source of law, i.e. treaties, from consideration. It does not bar the consideration of a right itself. As long as a right stems also from a source that is not a treaty, then § 1502 does not prohibit its consideration in this court. However, no matter what the

---

**10.** It is not disputed that, for the purposes of § 1502, international executive agreements, like the OLA, are considered treaties. *See Hughes Aircraft Co. v. United States*, 209 Ct.Cl. 446, 534 F.2d 889, 903, n. 17 (1976).

**11.** The plaintiffs have not identified a specific statute that gives this court jurisdiction to hear claims arising under the OLA. As this court has noted, "it is not up to the Court to look at every

conceivable statute ... to determine whether or not the plaintiff has made out a claim within this Court's jurisdiction." *Ashgar*, 23 Cl.Ct. at 233.

**12.** As noted above, however, although the court has jurisdiction to hear the plaintiffs' claims for breach of contract and violation of statutes and accompanying regulations, these claims fail as a matter of law.

right is, and no matter what other sources are available to bolster that right, the invocation of an otherwise reviewable right cannot work to force this court to interpret a treaty. Therefore, this court may not hear those claims that derive from the OLA, art. II, ¶ 6 and art. VI, ¶ 4. However, as noted above, the same rights may be, and have been, considered in connection with the plaintiffs' contract claims insofar as they are based on sources other than the OLA.

█ The plaintiffs' third claim under the OLA is that the OLA requires that TCNs' "[w]ages, salaries and monetary benefits ... be paid in U.S. dollars." OLA, Art II, ¶ 4. The plaintiffs claim that, since the TCNs were effectively paid in pesos due to the currency conversion process, they are entitled to recover in this court for violation of the OLA. However, since the source of this alleged right is the OLA, the court is plainly not able to hear this claim. *See* 28 U.S.C. § 1502. Accordingly, the government is entitled to dismissal of the plaintiffs' claims for violations of the OLA for lack of subject matter jurisdiction.[13]

## CONCLUSION

In view of the foregoing, the court finds, as a matter of law, that the government did not breach contracts of employment with plaintiffs Rosilla Adarbe, et al. The court also finds, as a matter of law, that the plaintiffs Rosilla Adarbe, et al. do not have a remedy for money damages in this court for any violation of the FSA, or any directives or regulations issued pursuant to the FSA. The court therefore **GRANTS** the government's March 24, 2003 motion for summary judgment on Count 1 and that portion of Count 2 of the plaintiffs' complaint which relates to statutory and regulatory violations. The court also finds that it does not have subject matter jurisdiction to hear any claims based on alleged violations of the OLA. The court therefore **GRANTS** the government's March 24, 2003 motion to dismiss these claims, without prejudice, for lack of subject matter ju-

risdiction. The clerk is therefore directed to enter judgment accordingly. Each party shall bear its own costs.

---

**13.** The plaintiffs are not left without a forum to hear alleged violations of the OLA. Although the court does not pass judgment on the merits of their claims under these provisions, it does note that the U.S. district courts are authorized to hear cases arising under Treaties, and have, in fact, examined the OLA itself. U.S. Const. art. III; 28 U.S.C. § 1331; *More v. Intelcom Support Serv.,* 960 F.2d 466 (5th Cir.1992); *Rodriguez v. Gaylord,* 429 F.Supp. 797 (D.Haw.1977).